961 S.W.2d 712 (1998)
331 Ark. 58
332 Ark. 189
Jacqueline WALLACE, Individually and as the Administrator of the Estate Of Larry Shannon Wright, Appellant,
v.
J. Frank BROYLES, Individually; Dean Weber, Individually; James Woody Woodell, Individually; Harp's Food Stores, Inc., Dr. John P. Park, Dr. Tom Philip Coker, Dr. Tom Patrick Coker, Dr. Walter "Duke" Harris, and Ozark Orthopaedic Sports Medicine Clinic, Ltd., Appellees.
No. 97-170.
Supreme Court of Arkansas.
January 15, 1998.
Opinion Denying Rehearing March 5, 1998.
*713 Joey McCutcheon, Fort Smith, Gary L. Richardson, Chad R. Richardson, Tulsa, for Appellant.
Constance G. Clark, Walter B. Cox, Woody Bassett, Fayetteville, Angela Jegley, Assistant Attorney General, Jeffrey A. Bell, Associate General Counsel, Little Rock, for Appellees.
GLAZE, Justice.
Shannon Wright was a varsity football player at the University of Arkansas who died of a self-inflicted gunshot wound on October 13, 1993. Shannon's mother, Jacqueline Wallace, filed suit on March 10, 1995, and an amended complaint on May 11, 1995, against the nine defendant-appellees, alleging that their negligent, wilful, wanton and malicious acts caused Shannon's death.[1]
In her complaint, Wallace alleged that controlled substances were stored and dispensed from the Broyles Athletic Complex without a proper registration from the Drug Enforcement Agency (DEA). Wallace asserted that, through the DEA registration of defendant-appellee Dr. John Park, defendant-appellee Dean Weber and others placed orders for Tylenol # 3, Darvocet, and other drugs through defendant-appellees James Woodell and Harp's Food Stores, and they had these controlled substances delivered to the athletic department at the University. Wallace further alleged that, over a fifteen-month period between November 1992 and January 1994relevant to when and immediately after Shannon played footballthe Arkansas State Police and DEA conducted an audit of these controlled substances purchased by the athletic department. Their audit was alleged to reveal that 13,079 dosage units had been purchased and dispensed, but only 3,352 dosage units could be documented and accounted for. Wallace also charged that the controlled substances were kept in an unlocked metal cabinet in the athletic training room and that University employees and athletes obtained controlled substances from the athletic department without prescriptions, labels, instructions, or warnings as to dangers or side effects. Wallace's complaint further alleged that defendant-appellees Drs. Tom Philip Coker, Tom Patrick Coker, and Walter Harris, through defendant-appellee Ozark Orthopaedic Clinic, authorized Weber to dispense controlled drugs to athletes; they kept no accurate records on the dosage units dispensed; and they failed to attend rehabilitation sessions of injured athletes.
Wallace further claimed that the foregoing improper dispensing of controlled substances took place even though, as early as June 1992, the NCAA had issued guidelines to defendant-appellees Frank Broyles, Director of Athletics, and Dean Weber, Head Athletic Trainer, providing that physicians could not delegate the authority to dispense prescription medications to athletic trainers. Even though these guidelines and warnings concerning possible dangers to athletes were given to University personnel, Wallace alleged no action was taken to avoid those dangers or to comply with the guidelines. Wallace specifically stated that Broyles and Weber knew or should have known of the potential harm to the athletes, but instead they proceeded with conscious indifference to the possibility of injury to student athletes and others.
Finally, Wallace alleged that Shannon sustained a severe shoulder injury during a football game on September 11, 1993, which later resulted in his undergoing extensive physical therapy treatments and taking heavy dosages of Darvocet supplied by University personnel and others without advice or warning of the drug's potentially dangerous side effects or of dangerous interactions with other drugs. Wallace's complaint concluded with allegations asserting that Broyles's and Weber's conduct, which proximately caused Shannon's death, was negligent, malicious, wilful and wanton, because among other things, they knew of the illegal dispensing of drugs in the athletic training room and knew of its danger to athletes. Wallace further concluded that Drs. Park, Tom Philip Coker, Tom Patrick Coker, Harris and the Ozark Orthopaedic Clinic were negligent in illegally dispensing narcotics with dangerous side effects, and that Shannon *714 was given and he consumed such drugs, causing his death.
One year after the filing of Wallace's amended complaint, the appellee doctors and the Ozark Orthopaedic Clinic filed a motion for summary judgment wherein they claimed no credible evidence existed upon which a jury could find Shannon had consumed any Darvocet prior to his suicide on October 13, 1993. Moreover, they claimed that Joe T. Barnes, a toxicologist, determined that there was no evidence that Shannon had any Darvocet or other drug except alcohol in his system at the time of his death. The appellee doctors asserted it was undisputed that Shannon, upset over breaking up with his girlfriend, Kit Carson, committed suicide after consuming large quantities of alcohol. Finally, the doctors submitted an affidavit given by Dr. Don McMillan, Chairman of the University Pharmacy and Toxicology Department, wherein McMillan averred that, based upon Barnes's test, no Darvocet was found in Shannon's body at the time of death. McMillan opined no depressive effect could have been present from Darvocet even if the drug had been consumed by Shannon prior to the forty-eight-hour period preceding his death.
One day after the doctors filed the motion for summary judgment, Woodell and Harp's Food Stores filed theirs, also claiming that there was no evidence that Shannon had taken Darvocet prior to his suicide or that any of the defendants had provided Darvocet to Shannon. Subsequently, Broyles and Weber separately filed motions for summary judgment that essentially adopted the defenses asserted in the earlier summary judgment motions. Broyles added that, under Ark.Code Ann. § 19-10-305(a) (Repl.1994), he is a state employee and immune from suit and civil liability for damages, from acts or omissions, other than malicious acts or omissions, occurring within the course and scope of his employment, except to the extent that he may be covered by liability insurance. Because he had no liability insurance coverage, Broyles asserted he was statutorily immune from suit and liability. In his summary judgment motion, Weber also adopted the defenses contained in the other defendants' motions, but like Broyles, claimed statutory immunity. However, because Weber conceded having insurance coverage, he claimed immunity except to the extent of his coverage.
On October 18, 1996, the circuit court undertook review of the defendant-appellees' motions for summary judgment, plaintiff-appellant's responses, along with the parties' respective, numerous pleadings, affidavits, depositions and exhibits, and after doing so granted the defendant-appellees' motions. First, the trial court dismissed suit with prejudice against Broyles, finding him to be a state employee who enjoyed statutory immunity from tort liability, since he had no insurance coverage and there was no evidence of malicious acts or conduct on Broyles's part. Second, the court found Weber a state employee and, as such, immune from suit, since there was no evidence of malice on his part. However, because Weber had liability insurance, the court found suit could lie against Weber to the extent of his insurance coverage, provided there was evidence showing he had been negligent. The circuit court next dismissed with prejudice the plaintiff-appellant's suit against all defendant-appellees, finding no evidence of negligence and stating its reasons as follows:
(1) There is no evidence before the court upon which reasonable minds could differ that [Shannon] consumed any significant amount of Darvocet prior to his suicide on October 13, 1993.
(2) There is no evidence before the court upon which reasonable minds could differ that Darvocet, even if consumed by [Shannon], caused or contributed to [his] suicide on October 13, 1993.
(3) There is no evidence before the court upon which reasonable minds could differ that any act or omission of any of the defendants caused or contributed to [Shannon's] suicide on October 13, 1993.
We initially point out the trial court's use of the wrong standard when deciding to grant summary judgment. As discerned from the foregoing findings, the trial court determined there was no evidence upon which reasonable minds could differ that Shannon consumed any significant amount of Darvocet prior to Shannon's suicide, or *715 that the defendants' acts caused his suicide. (Emphasis added.)
In its oral findings, the trial court also said that there is no evidence of any malice, and if there is any evidence, reasonable minds could not differ as to the conclusions to be drawn that there was no malice shown. (Emphasis added.) In addition, the trial court further held that "there is no evidence, sufficient evidence, to show that the actions of the defendants proximately caused [Shannon's] suicide because there is no evidence that reasonable minds could differ to the fact that he was using Darvocet at the time of his suicide, which was the proximate cause of that suicide." The law is well settled that summary judgment is to be granted by a trial court only when it is clear that there are no genuine issues of material fact to be litigated, and the party is entitled to judgment as a matter of law. Pugh v. Griggs, 327 Ark. 577, 940 S.W.2d 445 (1992). Once the moving party has established a prima facie entitlement to summary judgment, the opposing party must meet proof with proof and demonstrate the existence of a material issue of fact. Id. On review, this court determines if summary judgment was appropriate based on whether the evidentiary items presented by the moving party in support of the motion leave a material fact unanswered. Id. This court views the evidence in a light most favorable to the party against whom the motion was filed, resolving all doubts and inferences against the moving party. Id. Our review focuses not only on the pleadings, but also on the affidavits and other documents filed by the parties. Angle v. Alexander, 328 Ark. 714, 945 S.W.2d 933 (1997).
Significantly, and especially relevant in the present case, the standard to be applied in summary judgment cases is whether there is evidence sufficient to raise a fact issue, rather than evidence sufficient to compel a conclusion on the part of the factfinder. Caplener v. Bluebonnet Milling Co., 322 Ark. 751, 911 S.W.2d 586 (1995). When using the correct standard applicable to the granting of summary judgment, we must hold the trial court committed prejudicial error.[2]
We first consider Wallace's negligence claims as alleged against Weber, Woodell, Harp's Food Stores, Drs. Park, T. Philip Coker, T. Patrick Coker, Harris and the Ozark Orthopaedic Clinic, and whether a fact issue exists as to how these defendants' negligence proximately caused Shannon's death.[3]
Negligence is defined to mean the failure to do something which a reasonably careful person would do, or the doing of something which a reasonably careful person would not do, under circumstances similar to those shown by the evidence in this case. See AMI Civil 3rd 301. To constitute negligence, an act must be one from which a reasonably careful person would foresee such an appreciable risk of harm to others as to cause him not to do the act, or to do it in a more careful manner. Id. This court has held that to constitute actionable negligence, it is not necessary that the actor foresee the particular injury which occurred, only that the actor reasonably foresee an appreciable risk of harm to others. Jordan v. Adams, 259 Ark. 407, 533 S.W.2d 210 (1976). Proximate cause in a negligence action may be shown from circumstantial evidence, and such evidence is sufficient to show proximate cause if the facts proved are of such a nature and are so connected and related to each other that the conclusion therefrom may be fairly inferred. White River Rural Water Dist. v. Moon, 310 Ark. 624, 839 S.W.2d 211 (1992). Once again, because our review is of the trial court's granting of a summary judgment, we need only decide if the pleadings *716 and evidentiary documents raise a fact issue concerning whether the defendants' acts or omissions were negligence in the circumstances described, and whether they should have reasonably foreseen an appreciable risk of harm to others.
In our review, the record reflects that Weber and others connected with the University athletic department had been given a memorandum circulated by the National Collegiate Athletic Association (NCAA) and that memo showed controlled substances were being illegally dispensed to athletes. Subsequently, the Arkansas State Police and the DEA investigated this matter, and their investigation revealed that, between November 1992 and January 1994, the University athletic department had purchased 13,079 dosage units of controlled substances, but that records could be found accounting for only 3,352 units. The fifteen-month audit showed that while the University training room bought 8,500 dosage units of Darvocet, only 1,025 of the units had been accounted for by appropriate records. The investigators determined that athletic trainers would place orders with Harp's pharmacy department, and the drugs would be delivered to the athletic department. Defendant Woodell related that he filled prescriptions for the University athletic training room two or three times a week, nothing was in writing, and some drugs bore no labels or names. Defendant Dr. Park admitted giving trainers authorization to dispense drugs and said that he, individually, never dispensed medication to the athletes.
Officer Chris Anderson averred that Weber pled guilty to violating the Federal Controlled Substance Act by failing and refusing to keep records for storing and dispensing of controlled drugs. Dr. Park, the University team physician, admitted that he violated the federal drug act, and as a result, the DEA imposed restrictions on Park's DEA registration, prohibiting him from dispensing controlled drugs for two years. The State Police investigation reflected that the controlled drugs were kept in unlocked metal cabinets freely accessible by the athletes, and that packets of drugs bore no instructions or warnings and were dispensed by Weber and trainers without authorization or doctor's orders.
Drs. Park, Harris, Tom Philip Coker and Tom Patrick Coker of the Ozark Orthopaedic Clinic kept no accurate records to account for the drugs taken by the athletes, nor did these physicians attend the rehabilitation sessions for injured players after football games. Officer Anderson reported that Weber and these named physicians had been given the NCAA guidelines for dispensing drugs by Dr. Allen March, a physician at the University Student Health Center.[4] Dr. March also gave the same information to the women's athletic department, and while the men's athletic department failed to comply with the guidelines and federal drug law, the women's athletic department immediately removed all prescription medication from its training room. Anderson further reported that Weber, Dr. Harris and Associate Athletic Director Don Phillips met with Dr. March, but Weber actively resisted the idea of complying with the federal laws and new NCAA guidelines, or of hiring a new physician. Anderson said that Weber had a financial relationship as a sports medicine consultant with the Ozark Orthopaedic Clinic, and was paid $1,000.00 per month.
From the foregoing evidence, a fact issue clearly arises concerning whether Weber, Harper's Food Stores and the named defendant-doctors were negligent in the illegal and careless manner in which they dispensed controlled drugs to University athletes. This is especially so given their expressed and inferred knowledge of the potential harm that would result to others who would be the recipients of illegally dispensed drugs. As noted earlier, to be negligent, the defendants here need not be shown to have foreseen the particular injury which occurred, but only that they reasonably could be said to have foreseen an appreciable risk of harm to others.
And while Weber, Woodell, Harp's Food Stores and the defendant-doctors urge that no proximate-cause evidence was shown that Shannon had been supplied or had consumed *717 any of the controlled drugs in controversy, the record undermines that assertion. Although Wallace offered no direct testimony that Shannon received and consumed the Darvocet that was possessed and dispensed by the University's athletic department, considerable circumstantial evidence was presented. First, we mention the evidence that Darvocet was the acknowledged painkiller used in the athletic program and that it is a mind-altering drug which contains the active ingredient of propoxyphene. The warning connected to such ingredient and made a part of the record reads as follows:
Propoxyphene products in excessive doses either alone or in combination with other CNS depressants (including alcohol), are a major cause of drug-related deaths. Judicious prescribing of Propoxyphene is essential for safety. Consider nonnarcotic analgesics for depressed or suicidal patients. Do not prescribe Propoxyphene for suicidal or addition [sic] prone patients. Because of added CNS depressant effects, cautiously with concomitant sedatives, tranquilizers, muscle relaxants, antidepressants or other CNS depressant drugs. Advise patients of additive depressant effects of these combinations with alcohol. Many Propoxyphene related deaths have occurred in patients with histories of emotional disturbances, suicidal ideation or attempts, or misuse of tranquilizers, alcohol, or other CNS active drugs. Do not exceed the recommended dosage. (Emphasis added.)
As previously discussed, given the potentially harmful side effects that could result from the unsupervised taking of Darvocet by the athletes, in general, a fact issue is posed that such harm could reasonably have been expected in the circumstances described here, where, it has been said, these defendants had illegally permitted large orders to be indiscriminately accessible to anyone entering the athletes' training room. However, this circumstantial evidence is even stronger than showing the defendants' acts or omissions might cause an appreciable risk to other athletes; it further raises the additional, narrow factual issue that Shannon, in particular, had obtained Darvocet from the athletic department and consumed it. This proximate-cause evidence bears, too, on the legal issue concerning whether the actions of Broyles and Weber were malicious, thus, making them liable in tort even though, as state employees, they otherwise would be statutorily immune from suit.
This court has held that malice may be inferred where the evidence indicates that the defendant acted wantonly in causing the injury or with a conscious indifference to the consequences. See Stein v. Lukas, 308 Ark. 74, 823 S.W.2d 832 (1992); National By-Products, Inc. v. Searcy House Moving Company, Inc., 292 Ark. 491, 731 S.W.2d 194 (1987); Freeman v. Anderson, 279 Ark. 282, 651 S.W.2d 450 (1983). We list the following items of evidence produced at the summary judgment hearing from which a fact issue could arise regarding whether Broyles and Weber knew or had reason to believe their conduct would likely cause injury, whether they had reason to believe harm could result to Shannon and whether Shannon had consumed Darvocet from the University athletic department. We first set out that evidence bearing on the fact issue of whether Shannon consumed Darvocet that was dispensed from the athletic program. That evidence is as follows:
(1) Large orders of Darvocet were distributed and unaccounted for by the athletic department.
(2) Darvocet was the acknowledged painkiller used in the athletic program.
(3) Weber and Park admitted to violating federal drug laws related to the storing, dispensing and accounting of Darvocet.
(4) Joe Toher, a strength coach, averred that, after Shannon injured his shoulder in a football game, Toher noticed Shannon's erratic behavior, and Shannon told Toher that the University had Shannon on Motrin and "another pain medication."[5]

*718 (5) Steve Robison, a neighbor of Shannon's parents, said that Shannon told him he was "taking stuff" for his shoulder injury for pain and the [medicine] was given to him through the University training room. Shannon told Robison that he was taking more than he should, and that he had to "load up on painkillers just to practice with the team." Robison further averred Shannon said drugs were available to him at any time.[6]
(6) Wallace testified that, while she had no personal knowledge Shannon ever took Darvocet, she saw him take two white caplets in August of 1993, and she later identified the caplets as looking like Darvocet pills shown her by the United States District Attorney.
(7) Although Drs. Joe T. Barnes, Chief Toxicologist for the State Crime Laboratory, and Don McMillan, Chairman of the University Pharmacy and Toxicology Department, respectively related that Shannon's blood stream after death showed an alcohol content of .23% and no other drugs, and opined that Shannon had no depressant effect from Darvocet, Wallace furnished rebuttal statements. In this respect, Andrew Mason, a forensic toxicologist, testified that Barnes's and McMillan's interpretations were erroneous conclusions based on flawed and inadequate analytical studies and were scientifically unsupported. Mason questioned the defendants' experts' chain of custody as well as their testing procedures. In addition, Wallace's other expert, a professor at the University of Oklahoma Pharmacy and Medicine College, opined that, even if the active ingredients in Darvocet had not been detected in Shannon's blood sample, behavioral effects, including depression, could last for up to four weeks after an individual had stopped taking the drug.
In viewing the above evidence in the light most favorable to Wallace, the nonmoving party, we are compelled to hold a genuine issue of material fact exists regarding whether Shannon, prior to his suicide, had been consuming Darvocet from the University's supply of the drug.
We next list those evidentiary items that create a fact issue on whether Broyles and Weber acted with such conscious indifference to the consequences that malice may be inferred. Those items are as follows:
(1) State investigation showed Weber reported only to Broyles.
(2) Broyles and Weber were knowledgeable of the 1992 NCAA guidelines and findings concerning the illegal dispensing of controlled substances, and while Broyles denied knowing about the dispensing of medication procedures in the training room until December 1993 (after Shannon's death), he had requested recommendations in response to the NCAA memo.
(3) Broyles took no steps to change the illegal medication dispensing procedures and said that none of his staff or medical professionals advised him that changes should be made. In contrast, upon receipt of the NCAA guidelines, the women's athletic department immediately removed all prescription medication from its training room.
(4) Broyles is alleged to have had prior knowledge of an earlier incident involving a football player's taking Darvocet from the University athletic department's drug supply and becoming addicted to Darvocet. Debbie Burns averred her husband, Billy, had played football for Broyles from 1971 to 1974, and Billy became addicted to Darvocet through the University football program. Ms. Burns claims Broyles offered her a legal settlement not to take legal action against him.
(5) Weber admitted that individuals in the training center were not qualified to dispense drugs to athletes and conceded he knew the practice was potentially harmful. In fact, Weber would use placebos in place of Darvocet when he thought a football player was requesting Darvocet too often.
(6) Kelli Sheffield, an assistant trainer and University instructor, stated that, because of Weber's opposition, no changes were made in the handling and dispensing of medication.

*719 (7) Weber pled guilty to a federal criminal charge of failing to keep records related to the dispensing of controlled drugs.
(8) Weber knew Shannon had an alcohol problem and suicidal tendencies, and was aware of the danger when giving medication to a person experiencing such problems.
Again, when reviewing the foregoing evidentiary items in the light most favorable to Wallace, we conclude that, at the least, a material issue exists regarding whether Broyles and Weber acted with a conscious indifference as to the consequences that University athletes, and Shannon in particular, could suffer harm due to the drug-dispensing procedures employed by the athletic department.
In conclusion, we hold the trial court committed prejudicial error in utilizing the wrong standard when ruling on the defendants-appellees' summary judgment motions, and specifically erred in failing to hold the evidence raised fact issues as to whether Shannon consumed Darvocet illegally dispensed by the athletic department and whether those drugs contributed to or caused Shannon's death. In so holding, we further conclude, as previously discussed, that at the summary judgment stage of this litigation, Broyles and Weber are not statutorily immune from suit for tort liability.
For the foregoing reasons, the trial court's grant of the defendant-appellees' motions for summary judgment is reversed and remanded.
ARNOLD, C.J., CORBIN and THORNTON, JJ., dissent.
ARNOLD, Chief Justice, dissenting.
Although the majority correctly notes that the trial court applied the wrong evidentiary standard, it incorrectly concludes that Wallace offered proof of any genuine issue of material fact as to the essential element of causation. The majority's attention to the irrelevant, albeit unsavory, practices of the Athletic Complex, ultimately eclipses the well-settled rules of causation and logical legal argument that settle this case. Proximate causation cannot be based on mere coincidence. Wirth v. Reynolds Metal Co., 58 Ark.App. 161, 169, 947 S.W.2d 401 (1997). Fair-minded people could not conclude, without speculation, that allegedly negligent distribution of narcotics by the Athletic Complex caused Shannon Wright's suicide.
In meeting its burden of proof, Wallace and this Court engage in the logical fallacy known as post hoc, ergo propter hoc, literally "after this, therefore because of this." The fallacy results from confusing sequence with consequence. See BRYAN A. GARNER, A DICTIONARY OF MODERN LEGAL USAGE (2d ed.1995). To accept the argument that the mere timing of these two events, (i) negligent distribution of narcotics by the Athletic Complex and (ii) Wright's suicide, is sufficient to establish a causal connection, is to have this Court accept the faulty reasoning of post hoc, ergo propter hoc.
This fallacy in reasoning is aptly described as "Hydra-headed, and although cut off again and again, has the characteristic of an endless removal." Kramer Service Co. v. Wilkins, 184 Miss. 483, 186 So. 625, 627 (1939). See also Wirth v. Reynolds Metal Company, 58 Ark.App. 161, 947 S.W.2d 401(1997), holding that appellants failed to offer proof of proximate causation to support their negligence claim, relying on the persuasive authority of Western Geophys. Co. of America v. Martin, 253 Miss. 14, 174 So.2d 706 (1965), and the precedents upon which it relies, including Wilkins.
The Mississippi Supreme Court, in the Wilkins case, said:
That heresy is that proof that a past event possibly happened, or that a certain result was possibly caused by a past event, is sufficient in probative force to take the question to a jury. Such was never the law in this state, and we are in accord with almost all of the other common-law states.... "Post hoc ergo propter hoc" is not sound as evidence or argument.... Possibilities will not sustain a verdict. It must have a better foundation....
Wilkins, 186 So. at 627.
The Mississippi Supreme Court also noted, "It is not enough that negligence of one person and injury to another coexisted, but *720 the injury must have been caused by the negligence." The mere possibility that the injury complained of was caused by negligence is not sufficient to establish proximate causation or to sustain a verdict. Id.
First, the majority adheres its argument to the testimony of Wallace that she saw Wright with "two white caplets," which she claims to have identified later as Darvocet. However, Wallace failed to present any evidence to the trial court that Wright obtained the two white caplets from the Athletic Complex.
Second, the majority relies on the affidavit of a professor at the University of Oklahoma Pharmacy and Medicine College, who averred that propoxyphene, the active ingredient in Darvocet, may not be detected in a blood sample although behavioral effects could persist for four weeks. This line of argument begs the question. Although the drug's effect may allegedly linger in the body, there remains no evidence showing that Wright received any Darvocet from the Athletic Complex.
Further, the Chief Toxicologist for the State Crime Laboratory and the Chairman of the University Pharmacy and Toxicology Department presented evidence that Wright's blood stream after death revealed an alcohol content of .23% and no other drugs. Additional forensic evidence suggested that Wright had no allergic reaction. Wallace testified that Wright was allergic to the drug Wygesic and that he had an earlier episode of a fine, red rash all over his body when he took that drug. The Dean of the College of Pharmacy at UAMS testified that the two major active ingredients in Wygesic are the same as those found in Darvocet, and that if a person is highly allergic or sensitive to Wygesic, he would have a high probability of suffering the same or similar allergic or sensitivity reaction to Darvocet. Moreover, Wallace noted that Wright had no reaction that she observed after taking the "two white caplets." The medical evidence and testimony fail to offer proof of Wallace's assertion that Wright took Darvocet or received Darvocet from the Athletic Complex.
Assuming, arguendo, that we permit a jury to reach the question of Wright's tenuous identification of the two caplets as Darvocet, we must then permit a jury to consider whether two caplets constitute "excessive doses" of Darvocet, the amount of the product identified in the product warning as linked to a "major cause of drug-related deaths." Again, note that no drugs were found in Wright's system. There is no evidence that Wright's death was a "drug-related death," and the only evidence alleged is that Wallace saw Wright on one occasion with a total of two caplets that she later identified as Darvocet. There is no genuine issue of material fact for the jury to weigh.
Third, the majority poises its argument on the affidavit of the strength coach who stated that Wright told him that he was taking Motrin and "another pain medication." There is no evidence presented that this "pain medication" was Darvocet. Additionally, there remains the absence of any shred of evidence that the "two white caplets" identified by Wallace were obtained from the Athletic Complex.
To deny appellees' motion for summary judgment, we must have some evidence linking these "two white caplets" to the Athletic Complex. The majority enumerates the evidence that thousands of units of prescription drugs were distributed to athletes, that large orders of Darvocet were distributed, and that Darvocet was the acknowledged painkiller. However, the mere allegation that Darvocet was available at the Athletic Complex is insufficient to establish proximate causation or to sustain a verdict. Moreover, Wallace failed to offer any testimony from any physical trainer, fellow athlete, or University personnel in support of her theory that Wright obtained these "two white caplets" from the Athletic Complex. Indeed, the record is devoid of any testimony substantiating a causal connection. A myriad of possibilities remains as to where Wright could have gotten the "two white caplets." A jury could only conclude based on mere speculation and conjecture that he got the caplets from the Athletic Complex.
In St. Paul Fire & Marine Insurance Co. v. Brady, 319 Ark. 301, 891 S.W.2d 351 (1995), this Court considered proof of proximate *721 causation in the negligence context. St. Paul involved an elderly man whose injury and death might have been attributable to either a fall at a hospital, an earlier fall at home, or an aneurysm. The medical testimony indicated that a conclusion concerning the cause of the injury would be purely speculative, and all that remained was anecdotal information from a variety of witnesses. Noting that the jury was left to speculation and conjecture in deciding between two equally probable possibilities, this Court held that the trial court erred in failing to direct a verdict on the issue of the sufficiency of the medical evidence of proximate causation of injury and death.
Although proximate cause may be proved by either circumstantial or direct evidence, the proof must tend to eliminate other causes that may fairly arise from the evidence. St. Paul, 319 Ark. at 306, 891 S.W.2d 351 (citing McAway v. Holland, 266 Ark. 878, 599 S.W.2d 387 (1979)). Arguably, the evidence in St. Paul was more compelling than that in the instant case. The jury in St. Paul had testimony relating to the two falls as possibilities to consider. Here, we have no evidence of any causal connection with the one theory advanced by Wallace. The appellee in St. Paul could at least prove that the decedent had fallen twice. Here, we have no evidence that Wright obtained any Darvocet from the Athletic Complex or that he ever took any Darvocet obtained from any source whatsoever.
One cause of Wright's death that fairly arises from the evidence is that Wright committed suicide because he was depressed over the breakup of his girlfriend, Kit Carson. Wright was a troubled young man who had been an alcoholic for years. His alcohol and emotional problems existed prior to his September 11, 1993, football injury and continued until his death. He had threatened to commit suicide on several occasions. On one occasion, after an argument with his girlfriend, he slit his wrists. Prior to his suicide, he had broken up with his girlfriend. The night he shot himself, Wright told a friend that he was "very hurt" over the breakup "and didn't care what was going to happen from then on ..." As Wright stated in a note he wrote shortly before his death, "I have recently just suffered the biggest loss of my life. Her name was Kit. There is nothing left but one of two alternatives. Either death or dedication to work. For now I'll choose the ladder [sic], so I will plan out every step of the day ... Conditionmiserable, empty, burdened." He unfortunately chose the first option. The evidence offered by Wallace does not tend to eliminate this conceivable yet tragic possible cause of Wright's death.
In another apposite case, a person who had been in an automobile wreck and no longer had "any get-up-and-go" suddenly died four weeks after the wreck. McAway v. Holland, 266 Ark. 878, 599 S.W.2d 387 (1979). In McAway, the Arkansas Court of Appeals affirmed the trial court's finding that the death was not proximately caused by the accident and observed that lay testimony on cause of death is unacceptable. The court noted:
There is no circumstantial evidence even the most scantwhich suggests a causal connection between the accident and death. The mere fact both happened about a month apart proves nothing. If there had been some evidence of causal connection maybe the lay testimony might have been slight corroboration. However, standing alone it is nothing....
McAway, 266 Ark. at 883, 599 S.W.2d at 390.
The majority opinion clouds the dispositive issues in this case that mandate affirmance. Even if appellees' failure to implement appropriate procedures for handling the distribution of prescription drugs amounted to negligence, Wallace fails to make the causal connection between that negligence and her son's suicide, an essential element in her negligence action. Moreover, the majority's conclusion that appellees acted with malice is wholly unsupported by the evidence.
A review of the pleadings, depositions, and other filings reveals, in my opinion, that there is no genuine issue of any material fact. Viewing all evidence in the light most favorable to Wallace, and resolving doubts against the appellees, the appellees are entitled to summary judgement as a matter of law. After appellees made a prima facie showing of entitlement to summary judgment, Wallace *722 failed to meet proof with proof, and she is not entitled to rest on mere allegations or conjecture but must set forth specific facts demonstrating a genuine issue of fact.
Accordingly, I believe that the trial court's judgment granting summary judgment in favor of appellees should be affirmed.
CORBIN and THORNTON, JJ., join.

PETITION FOR REHEARING
Frank Broyles, Dean Weber, James "Woody" Woodell, Harp's Food Stores, Inc., Dr. John P. Park, Dr. Tom Philip Coker, Dr. Tom Patrick Coker, Dr. Walter "Duke" Harris, and Ozark Orthopaedic Sports Medicine Clinic, Ltd., petition for rehearing. They contend that we erred in our statement that the wrong standard was applied by the trial court in granting their motion for summary judgment. We disagree and deny the petition.
The argument is that we have, in prior summary-judgment appeals, used the very terminology used by the trial court here, i.e., whether "reasonable minds" could differ as to a factual conclusion to be reached. The petitioners set forth the following five of our earlier decisions in support of their point.
In Thomas v. Sessions, 307 Ark. 203, 818 S.W.2d 940 (1991), we reversed a summary judgment in a wrongful-death case after pointing out that the potential evidence shown by discovery responses was in conflict. Although we spoke of "weighing" the proof, we wrote:
Some courts apply the "scintilla of evidence" rule which requires a court considering summary judgment to admit the truthfulness of all evidence favorable to the nonmovant, thereby removing all issues of credibility from the case, and determine if there are any facts from which a jury could reasonably infer ultimate facts upon which a claim depends; if so, the case must be decided by the factfinder. Schoen v. Gulledge, 481 So.2d 1094 (Ala.1985). Our own rule is similar:
The object of summary judgment proceedings is not to try the issues, but to determine if there are any issues to be tried, and if there is any doubt whatsoever, the motion should be denied.
Rowland v. Gastroenterology Assoc., P.A., 280 Ark. 278, 657 S.W.2d 536
In a subsequent paragraph we stated, "We have said that summary judgment is not proper where evidence, although in no material dispute as to actuality, reveals aspects from which inconsistent hypotheses might reasonably be drawn and reasonable minds might differ." Although we thus used the term "reasonable minds," the context makes it clear that we were concerned with that part of Ark. R. Civ. P. 56(c) which entitles a moving party to a summary judgment if "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Although facts may not be in dispute, they may result in differing conclusions as to whether the moving party is entitled to judgment as a matter of law. We say again that, in such an instance, summary judgment is inappropriate.
Cox v. McLaughlin, 315 Ark. 338, 867 S.W.2d 460 (1993), is another case in which we reversed a summary judgment. We wrote:
The standard of review in these cases is well settled. Summary judgment should be granted only when it is clear that there are no genuine issues of material fact to be resolved. If there is any doubt as to whether there are issues to be tried, the motion should be denied. In this case the defendants, as the moving parties, bore the burden of showing that there were no genuine issues of material fact. Plaintiff is entitled to have all doubts and inferences resolved in his favor, and summary judgment is not proper if reasonable minds could reach different conclusions when given the facts. Tullock v. Eck, 311 Ark. 564, 845 S.W.2d 517 (1993)."
Again, we used the "reasonable minds" language but it was in combination with our concern with whether, although there might be no dispute as to underlying facts, different conclusions could be reached. Summary judgment was inappropriate.
Tyson Foods, Inc. v. Adams, 326 Ark. 300, 930 S.W.2d 374 (1996), was a legal malpractice *723 action in which a summary judgment was granted in favor of the defendant-attorney. The summary judgment was premised on the fact that, although the attorney had been negligent, the damages claimed by the plaintiff resulted from events which were not proximately caused by the defendant's negligence. In other words, the plaintiff had failed to produce evidence on an element of its claim. We wrote:
Tyson [the plaintiff] questions the determination of proximate [cause] by means of summary judgment. Summary judgment is to be granted by a trial court when it is clear that there is no genuine issue of material fact to be litigated, and, on appellate review, the appellate court determines if the granting of summary judgment was appropriate based on whether the evidentiary items presented by the moving party in support of the motion leave a material question of fact unanswered. Knowlton v. Ward, 318 Ark. 867, 889 S.W.2d 721 (1994). While the question of proximate cause is usually a question for the jury, when the evidence is such that reasonable minds cannot differ, the issue becomes a question of law to be determined by the trial court. Skinner v. R.J. Griffin & Co., 313 Ark. 430, 855 S.W.2d 913 (1993). The granting of summary judgment can be appropriate in a legal malpractice suit. [Citation omitted.] Here, there was no question of material fact to be determined, and the evidence was such that reasonable minds could not differ about proximate cause. Thus, the trial court correctly granted summary judgment.
Obviously we did not mean, by the reference to "reasonable minds," that the evidence was in a state to be weighed and we were doing so. Rather, we held the plaintiff's case was lacking in the element of proximate causation. There was no possibility of varying conclusions and no remaining issue of fact because of the lack of evidence of proximate causation. In Cragar v. Jones, 280 Ark. 549, 660 S.W.2d 168 (1983), a divided court reached a similar result on the ground that the plaintiff had presented no evidence of proximate causation.
The final Arkansas case cited by the petitioners is Union Pac. R.R. Co. v. Sharp, 330 Ark. 174, 952 S.W.2d 658 (1997). That was a case in which the issue was whether a verdict should have been directed in favor of the defendant after the evidence had been produced at the trial. It was not a summary-judgment case. We wrote, correctly, that "proximate causation becomes a question of law only if reasonable minds could not differ." In the directed-verdict context we are, as is the trial court, in a position to make that call even though there may be some conflicting evidence.
Also cited by the petitioners is Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986), in which the Supreme Court stated that the summary-judgment standard "mirrors the standard for a directed verdict." That statement was repeated by the Supreme Court, although it was not the basis of the holding, in Celotex Corp. v. Catrett, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986), a case we have cited often for other language concerning summary-judgment law but not for the "mirror" concept.
If it has not been clear heretofore, we hope this opinion clarifies that, although we follow federal courts' interpretation of the parallel rule, F.R.C.P. 56(c) when possible for the sake of uniformity, we have never gone so far as to say, much less hold, that we will make a "sufficiency of the evidence" determination when a summary-judgment motion is at issue. We regard that directed-verdict standard, used in ruling on motions made pursuant to Ark. R. Civ. P. 50, as being somewhat different from the summary-judgment standard.
We have ceased referring to summary judgment as "drastic" remedy. We now regard it simply as one of the tools in a trial court's efficiency arsenal; however, we only approve the granting of the motion when the state of the evidence as portrayed by the pleadings, affidavits, discovery responses, and admissions on file is such that the nonmoving party is not entitled to a day in court, i.e., when there is not any genuine remaining *724 issue of material fact and the moving party is entitled to judgment as a matter of law.
Petition denied.
NOTES
[1] A tenth defendant named Lester Hosto was sued, but later was non-suited without prejudice.
[2] While there is no need to dwell on the point, the dissenting opinion relies on cases involving directed verdict rulings and verdicts, and whether substantial evidence existed to support a verdict. The only case cited that concerns a motion for summary judgment is a court of appeals case, Wirth v. Reynolds Metal Co., 58 Ark.App. 161, 947 S.W.2d 401 (1997), where, unfortunately, the court mistakenly utilized directed-verdict cases when determining whether the trial court erred in granting Reynolds Metals Company a summary judgment. For a correct analysis, see the dissenting opinion in Wirth, 58 Ark.App. at 170. 947 S.W.2d 401.
[3] Because Weber, as a state employee, may be liable in tort for negligence to the extent of his insurance coverage, he, unlike Broyles, is included in the analysis and proof on negligence.
[4] Dr. March had no authority over the athletic department.
[5] We find nothing in the record to indicate the defendants moved to strike the affidavits of Toher or Robison, nor did they obtain a ruling from the trial court regarding their admissibility. Further, it was never argued, on appeal or below, that Toher's statement was inadmissible hearsay.
[6] Id.