Cliff BIEDENHARN, Earl Oxford, and Dan Melton v. Bobby HOGUE

98-1463                                                    1 S.W.3d 424

Supreme Court of Arkansas
Opinion delivered October 7, 1999

[Petition for rehearing denied November 18, 1999.*]

---

* BROWN and SMITH, JJ., would grant.

*Oscar Stilley*, for appellants.

*Barrett & Deacon*, by: *J.C. Deacon* and *D. P. Marshall Jr.*, for appellee.

Tom Glaze, Justice. This case involves former Speaker of the Arkansas House of Representatives, appellee Bobby Hogue. In February of 1997, Hogue was hired as Arkansas State University's (ASU's) Assistant Athletic Director for Development, a newly created position authorized and funded by the 1997 General Assembly when Hogue was Speaker. Actually, ASU officials had agreed to create the position in 1996, and had unsuccessfully offered the job to two other men before Hogue was hired. Nonetheless, appellants, a group of taxpayers, later initiated this litigation questioning whether Hogue was involved in creating the new position and whether his employment in the position was lawful. Jurisdiction of this case on appeal is in our court because issues have been raised concerning the interpretation of the Arkansas Constitution and Act 34 of 1999. *See* Ark. Sup. Ct. R. 1-2(a)(1) and (b)(6).

The relevant facts leading to this lawsuit follow. As indicated above, although ASU officials had no one in mind for the university's new athletic director position, appellant taxpayers became concerned when Hogue was offered and accepted the job. Hogue began working as the assistant athletic director in April of 1997, but the job was terminated on June 30, 1998, one day before the Governor issued an executive order prohibiting state legislators from working for state agencies.

On November 6, 1997, the taxpayers filed suit against Hogue alleging that Hogue aided in creating the position, and, in doing so, 1) contravened Ark. Code Ann. § 19-4-1604 (Repl. 1998), which prohibits a person from drawing salaries from two different state agencies; 2) violated Ark. Const. art. 5, § 10, which prohibits a member of the General Assembly from being elected or

appointed to any "civil office"; 3) violated Ark. Const. art. 16, § 4, by making a profit out of or misusing public funds by taking the job; and 4) violated his oath of office.

In February of 1998, the Attorney General intervened, adding allegations of 1) breach of fiduciary duty, 2) separation of powers, 3) incompatibility of offices, and 4) usurpation of office. The complaint in intervention also fleshed out the taxpayers' "civil office" allegations. The Attorney General later abandoned the incompatibility allegation.

In July of 1998, the Attorney General dismissed his complaint; however, the taxpayers were permitted to proceed and to adopt the Attorney General's viable allegations as their own. On July 20, 1998, Hogue filed a motion for summary judgment; he attached thirteen affidavits, including the statements of Dr. Les Wyatt, President of ASU, and Barry Dowd, ASU's Athletic Director. Both Wyatt and Dowd averred that Hogue had not been involved in any way in the creation of the assistant athletic director position and that no promises of extra funding or threats of decreased money for the university were made in conjunction with the new position. Hogue's motion also posited that the legal controversy regarding his employment became moot when he ended his employment on June 30, 1998. The taxpayers offered no counter-affidavits, and the trial court granted summary judgment in favor of Hogue. Appellants appeal, raising five points for reversal. Hogue responds to the merits of appellants' arguments, but first submits that this legal controversy has been made moot not only by the termination of his employment on June 30, 1998, but also by the General Assembly's enactment of Act 34 of 1999. We address the mootness issue first, since if this case is now moot, we need not reach the appellants' points for reversal.

■ A case is moot when any decision rendered by this court will have no practical legal effect on an existing legal controversy. *Wilson v. Pulaski Ass'n of Classroom Teachers*, 330 Ark. 298, 301, 954 S.W.2d 221, 223 (1997). As just mentioned, not only did Hogue's employment with ASU end on June 30, 1998, but during the 1999 session of the General Assembly, the legislature passed Act 34. Section 2(a)(1) of that Act provides in pertinent

part that "no person elected to a constitutional office [including the House of Representatives] may, after being elected to the constitutional office, and during the term for which elected, enter into employment with any state agency. . . ." "State agency" is defined under the act to include state-supported colleges and universities such as ASU. *See* Act 34, Section 1(a). The Act further provides that former members of the General Assembly shall not be eligible to be employed by any state agency within two years after he or she leaves office in any job which was created by the legislature within two years prior to his or her leaving office. Act 34, Section 2(e).

In sum, Act 34 now makes it unlawful for a member of the General Assembly to enter into employment with a state agency like Hogue did in 1997. Thus, any decision we may render in this case will have no precedential value since the General Assembly has now in clear terms made it unlawful for any legislator to be employed by a state agency under the circumstances in which Hogue found himself in this legal controversy.

The only remaining issue with respect to mootness is whether Hogue must refund the monies he received as an ASU employee. Our case law has established the rule that, even if an officer holds a job and provides services illegally, he may retain the *quantum meruit* value of the services he provided. *Harris v. Revis*, 219 Ark. 586, 243 S.W.2d 747 (1951). In the *Revis* case, Harris was the mayor of Clarksville and also worked as a laborer for the Clarksville water and light departments, drawing a salary for both positions. In an illegal-exaction suit brought by several concerned taxpayers, the *Revis* court held that Harris was entitled to retain the *quantum meruit* value received for his services even though he was holding the water and light department job in violation of a state statute. The court further ruled in *Revis* that the critical factor was the fact that the General Assembly had not declared any such contracts (*i.e.*, between a municipal officer and a provider of services to the municipality) to be "null and void." Quoting from *Gantt v. Ark. Power & Light Company*, 189 Ark. 449, 74 S.W.2d 232 (1939), the court said:

> In the absence of the prohibitory words "null and void" and where the contract has been performed by the parties in good

faith, compensation may be retained measured by the reasonable value thereof. Such recovery, however, is not because of the contract, but is grounded squarely upon the proposition that valuable services having been rendered which have been accepted by the parties, it would be inequitable and unjust to permit one party to substantially gain under the contract to the great and irreparable damage of the other.

219 Ark. at 590-591, 243 S.W.2d at 750.

■ Consistent with the holdings in *Revis* and *Gantt*, this court also later decided the case of *Starnes v. Sadler*, 237 Ark. 325, 372 S.W.2d 585 (1963). There, even though members of the General Assembly illegally held office as members of state boards, this court held that, in the absence of a showing of fraudulent intent by the members, the members were not required to account for the services and expenses they had incurred.

■ Throughout this litigation, the taxpayers have insisted that Hogue's job was a mere sinecure, that is, a "position or an office that requires little or no work but provides a salary." *American Heritage College Dictionary* 1270 (3d ed. 1997). The evidence submitted by Hogue, however, proves quite the contrary. Attached to Hogue's affidavit in support of his motion for summary judgment is a memo he prepared for Dr. Wyatt, summarizing his activities from July of 1997 to April of 1998. During that time he raised approximately $175,000 for ASU and lined up another $75,000 in corporate endowments. The primary purpose of the assistant athletic director position was to raise funds for ASU, and Hogue certainly accomplished that goal. As such, he should be allowed to retain the value of the services he performed.

In addition, no one contends the employment contract entered into between Hogue and ASU contained the prohibitory words "null and void" noted in *Revis*. Thus it appears that the only situation in which a refund of money would be in order is that in which there is evidence of fraud or evidence that the person in question acted in bad faith.[1] No such evidence exists.

---

[1] The current situation should not be confused with the one presented in *Massongill v. County of Scott*, 337 Ark. 281, 991 S.W.2d 105 (1999). In that case, we held that money paid to quorum court members in the form of insurance premiums actually constituted an

Hogue offered thirteen affidavits, all of which stated there was no behind-the-scenes finagling on his part to land the job. Appellants point only to a February 1997 conversation wherein Hogue mentioned to Dr. Wyatt that he would soon be "term-limited" out of office and would like to be kept in mind for any job that might open at ASU. There was no indication, however, that Hogue knew at that time ASU had already made plans to develop a new assistant athletic director position.

■ ■ In fact, every affidavit submitted with Hogue's motion for summary judgment states emphatically that there was no *quid pro quo* involved and that Hogue never conditioned any of ASU's funding on his being given the job. Not a single one of the affidavits was rebutted by the taxpayers. When the trial judge asked the taxpayers if they wanted to offer any counter-proof, they said no. While Hogue's statement to Dr. Wyatt aroused the appellants' suspicion, there was simply *no* evidence from which a genuine issue of material fact could be inferred that Hogue acted with fraudulent intent or bad faith. *See Wallace v. Broyles*, 331 Ark. 58, 66, 961 S.W.2d 712, 715 (1998). As we recently held, a party's suspicions about motive do not give rise to a genuine issue of material fact. *Hodges v. Huckabee*, 338 Ark. 454, 464, 995 S.W.2d 341, 348 (1999). Indeed, the proof presented below showed that Hogue never acted to create the assistant athletic director job and that ASU alone had done so prior to its later consideration of Hogue. In addition, Hogue openly withdrew his participation in any of the legislative processes which had to do with either ASU's budget or the new director job; nor did he ask any legislative member to assist him in creating a job or salary for him. As a matter of law, summary judgment was therefore appropriate, as the undisputed evidence shows that Hogue committed no fraud but, instead, acted in good faith. The most that could be said is that, in hindsight, especially with the later enactment of Act 34, he may have acted improvidently by accepting the ASU job.

---

illegal exaction, as those benefits were not authorized by then-existing state law. The ordinance allowing for the insurance payments had been illegally enacted in the first place. Here, there was nothing unlawful about the creation of the ASU job or its salary.

In any event, the General Assembly by enacting Act 34 has now made the law crystal clear that it is unlawful for legislators to work for state agencies like Hogue did in this controversy. Whether Hogue's employment was or was not lawful prior to Act 34 is of no consequence — it is now illegal, making this litigation moot. In sum, we know now such employment is unlawful, and a legal controversy like the one now before us is unlikely to recur. Moreover, because there is no evidence suggesting fraud or bad faith by Hogue in this matter, we agree with the trial court that Hogue is entitled to retain his salary earned while performing as ASU's assistant athletic director. Therefore, we affirm the trial court's decision granting Hogue summary judgment.

BROWN, IMBER, and SMITH, JJ., dissent.

ROBERT L. BROWN, Justice, dissenting. The majority affirms summary judgment in favor of former Speaker of the House Bobby Hogue. In doing so, the majority concludes that there are no issues of fact presented by the plaintiffs' complaint, and, as a result, judgment should be summarily entered in favor of Hogue. Because I believe there are issues of fact raised in this case that cannot be disposed of by an abbreviated procedure, I dissent.

The affidavits filed by the ASU officials present the first issue of fact: who made the first overture about a job at the university for Hogue? The trial court found that ASU approached Hogue about development work for the athletic department. That finding, however, overlooks the fact that it was Hogue who initially raised the issue of a potential job at ASU with President J. Leslie Wyatt. After the General Assembly convened in 1997, Dr. Wyatt describes in his affidavit what occurred in that conversation:

> In a casual conversation with Bobby Hogue over lunch in early February, Mr. Hogue mentioned that he would be leaving the legislature after this session due to term limits and that he would like for us to keep him in mind if any positions became open at ASU. In [a] later conversation with Barry Dowd, I mentioned Mr. Hogue's comment about possibly working for ASU and asked Mr. Dowd if Mr. Hogue would be a good candidate for the Assistant Athletic Director for Development position we intended to establish. I was aware that other state supported

universities had employees serving in the legislature and knew of no prohibition to the hiring of a member of the legislature to a position at ASU. Mr. Dowd and Mr. Hogue later met and Mr. Dowd reported to me that he believed Mr. Hogue would be an excellent choice to serve as Assistant Athletic Director for Development. Mr. Hogue was ultimately hired on February 22, 1997.

ASU Athletic Director Barry Dowd confirmed those events in his own affidavit:

During the legislative session of 1997, Dr. Wyatt telephoned me to tell me that in a casual conversation with Bobby Hogue over lunch, Mr. Hogue mentioned that he would be leaving the legislature after this session due to term limits and that he would like for us to keep him in mind if any positions became open at ASU. He asked me whether I believed Mr. Hogue would be a good candidate for the Assistant Athletic Director for Development position we intended to establish. I did not know Bobby Hogue but arranged a meeting with him to discuss whether he would be interested in working in athletic development. After the interview, I reported to Dr. Wyatt that I believed Mr. Hogue would be an excellent choice to serve as Assistant Athletic Director for Development. I offered the position to Mr. Hogue and while he was considering the offer inquired of another candidate, Barry Sellers, if he would take the position if the person currently under consideration declined. Mr. Hogue accepted the job and we announced his employment at a press conference on February 22, 1997. Fayeth Williams Hurt was hired to work with existing supporters.

The two affidavits make it clear that Hogue first broached the subject about a job to Dr. Wyatt "in early February" and was hired as Assistant Athletic Director for Development within a matter of weeks on February 22, 1997. To state the obvious, this all took place during the legislative session when Hogue was Speaker of the House and when ASU's budget for the next biennium, which included the Assistant Athletic Director position, as well as various capital improvement projects in separate bills were pending before the General Assembly.

The majority makes much of the fact that Hogue did not vote on Act 688, which is the ASU appropriation. But I do not believe that fact alone decides the issue. Hogue was hired for the

position of Assistant Athletic Director on February 22, and this fact was publicized by ASU the following day. Act 688 appropriated funds for all positions at ASU from the president on down and in some cases provided major salary increases for positions like the football and basketball coaches. It also provided that the newly created position of Assistant Athletic Director would pay $71,000 in 1997-98 and $73,000 in 1998-99. The bill which became Act 688 made its way through the Senate and House in February and March of 1997. It was common knowledge that the bill created a new position for the Speaker of the House. In fact, House Resolution 1027 was passed by House members on March 10, 1997, congratulating Hogue on his new position. On March 19, 1997, Act 688 was signed into law by the Governor.

It strains credulity to argue that the inclusion of a new position with a significant salary for the Speaker of the House of Representatives did not bolster the chances of the appropriation's passage. I cannot say categorically that ASU did not benefit from Hogue's agreement to accept this position which was well publicized before ASU's appropriation was signed into law. In addition, Hogue co-sponsored three pieces of legislation at this session, which involved multi-million dollar capital projects for ASU. Under different circumstances, this would fall under the heading of effective legislation for a constituent, but in the glare of the new job, there is the appearance of a *quid pro quo* from the Speaker. At least, this series of events creates an issue that should be developed at trial.

Next, the majority maintains that this matter is moot because Act 34 of 1999 subsequently made it a felony for a state representative to be employed by any state agency during that representative's term of office. Act 34 became effective on February 9, 1999. The majority's conclusion, however, gives short shrift to the plaintiffs' illegal exaction suit for the salary received by Hogue between April 21, 1997, and June 30, 1998. Clearly, Act 34 had no effect on the claim for the salary received before the effective date of the Act.

The majority goes on, though, and maintains that even assuming Hogue served illegally as Assistant Athletic Director, he

earned his salary in full as a fundraiser and coordinator of legislative events and, thus, should not be required to reimburse the State. I do not agree that we can reach that conclusion by summary judgment. Our caselaw is clear, and the majority acknowledges this, that the principle of *quantum meruit* only comes into play when the public employee serving illegally is doing so *in good faith*. *See Beshear v. Ripling*, 292 Ark. 79, 728 S.W.2d 170 (1987); *Martindale v. Honey*, 261 Ark. 708, 551 S.W.2d 202 (1977); *Revis v. Harris*, 219 Ark. 586, 243 S.W.2d 747 (1951); *Gantt v. Ark. Power & Light Co.* 189 Ark. 449, 74 S.W.2d 232 (1939). Here, the underlying issue of fact is whether Hogue was operating in good faith when he made the first overture to ASU's president about a job when that overture occurred during the legislative session. The pertinent Ethics Statute reads in part: "No public official or state employee shall use his position to secure special privileges . . . ." Ark. Code Ann. § 21-8-304(a) (Repl. 1996). If Hogue violated that statute by using his position to obtain a state job, it is difficult for me to see how he can jump through the hoop of good faith. In any case, this issue should be decided by trial and not by summary judgment.

I do agree with the majority that there is no basis for the plaintiffs' claims that Hogue was appointed to "a civil office" or that he was working for two state agencies. But I am convinced that an issue of fact has been raised by the affidavits submitted on behalf of Hogue concerning whether he used his position for private gain under § 21-8-304(a).

I would reverse and remand for trial, and for that I reason, I respectfully dissent.

IMBER and SMITH, JJ., join.