**L. C. EDDY, INC., Appellant,**

v.

**CITY OF ARKADELPHIA, ARKANSAS,**
Appellee.

No. 16874.

United States Court of Appeals
Eighth Circuit.

June 4, 1962.

James W. Chesnutt of Wood, Chesnutt & Smith, Hot Springs, Ark., made argument for the appellant and filed brief.

Otis H. Turner, Arkadelphia, Ark., made argument for the appellee and filed brief.

Before SANBORN and MATTHES, Circuit Judges, and GRAVEN, Senior District Judge.

MATTHES, Circuit Judge.

The question this appeal presents for determination is whether the City of Arkadelphia, Arkansas, appellee, is liable for the balance due L. C. Eddy, Inc., appellant, for construction of the airport facilities adjacent to the City of Arkadelphia. Resolution of the controversy requires the construction of the Arkansas "Airport Commission Act" (hereinafter referred to as "Act") § 74–501 et seq. Ark.Stats.1947 Anno.1957 Replacement, and more precisely, the legal status of the Arkadelphia Airport Commission, created pursuant to said statute—whether or not it was acting as an agency of the City of Arkadelphia in the transactions which gave rise to this lawsuit.

Before proceeding to a discussion of the legal principles involved, we briefly review the facts, which so far as this appeal is concerned, are undisputed.

On March 7, 1957, pursuant to the Act the City of Arkadelphia created its Airport Commission, and the following November the electorate approved the issuance of bonds in the amount of $45,000 for the acquisition of land and construction of an airport. Subsequent thereto an Advertisement for Bids was issued by the "Board of Airport Commissioners City of Arkadelphia" which advised that "Sealed proposals will be received by the City of Arkadelphia, Arkansas * * * for the construction of airport improvements adjacent to the City of Arkadelphia, Arkansas * * * "

Under date of April 8, 1959, a written "contract agreement" was entered into "by and between the City of Arkadelphia, Arkansas, Party of the First Part, acting through its duly authorized representative, and L. C. Eddy, Incorporated, * * * Party of the Second Part." This contract was executed by an officer of Eddy and

"Board of Airport Commissioners
City of Arkadelphia
Arkadelphia, Arkansas
By: W. C. Whorley, Chairman."[1]

Under the agreement Eddy was obligated to furnish all labor and materials required in the airport construction, and the City of Arkadelphia agreed to pay the lump sum of $69,027.41 as adjusted for variation of quantities at the unit prices named in the proposal attached to the contract. Pursuant to a provision of the contract, Eddy furnished a performance and payment bond with The Home Indemnity Company as surety (hereinafter referred to as Surety), which secured as obligee the City of Arkadelphia, designated therein as "Owner." The record indicates that Eddy completed construction of the project and that the airport was accepted by the city on November 20, 1960.

During performance of the contract a dispute arose between Eddy, the City of Arkadelphia, and the Airport Commission in regard to measurement of "Unclassified Excavation." The dispute was submitted to arbitration in accordance with the provisions of the general conditions in the specifications which were a part of the contract, and the arbitrators found in favor of Eddy. Thereafter, D. H. Garner, the excavation sub-contractor for Eddy, instituted an action in the Pulaski County Arkansas Circuit Court against Surety. Because of diversity of citizenship and the amount involved, the action was removed to the United States District Court for the Eastern District of Arkansas. After removal and on motion of Surety, Eddy was brought into the case, and upon the latter's motion, the City of Arkadelphia and the Airport Commission of the City of Arkadelphia were also brought in as parties to the litigation.

The issues were submitted on stipulations, responses to requests for admissions, and documentary evidence. The trial court found that the arbitration award was valid and binding on all of the parties except the City of Arkadelphia; that Garner was entitled to judgment against Surety; that Surety, in turn, was entitled to judgment over against Eddy; that Eddy was entitled to judgment against the Airport Commission but that the City of Arkadelphia was not liable to Eddy "for the contracts of the Airport Commission * * *." In its memorandum opinion the trial court stated: "I believe that at least for the purposes of this action the Arkadelphia Airport Commission is a legal entity independent of the City of Arkadelphia and that the City is entitled to judgment in its favor." No authorities were cited to support such conclusion.

Docket entries indicate that the judgments in favor of Garner and Surety have been satisfied, and the sole issue on appeal is Eddy's right to judgment against the City of Arkadelphia.[2]

■ Apparently the question is one of first impression in Arkansas. The Supreme Court of that state has not to our knowledge had occasion to construe the statute for the purpose of determining the status of an Airport Commission created by a city, i. e., whether or not the Commission is an agency or instrumentality of the city so that the city becomes liable for the acts and functions of the Commission performed within the scope of its authority. However, from our analysis of the pertinent provisions of the Act and controlling principles of law, we find no basis for holding that the Act was designed to relieve the city from liability in a situation such as this record presents.

1. The record indicates that Whorley was a member of the Commission.

2. The record indicates that the Airport Commission does not have funds to pay Eddy's judgment.

In its scope, it is clear that the Act is in the nature of enabling legislation, authorizing the city to delegate management of airport facilities to a Commission. We summarize the pertinent provisions of the Act for the purpose of illustrating that the legislation is in no way designed to create a separate corporate body, apart from and beyond the control of the city, emphasizing those portions which are especially appropriate to the issue:

Any first-class city *"owning and operating* a municipal airport" may create a Commission "for the purpose of *operating and managing* said airport"; [3] the Commission is to be created by ordinance, and to consist of five citizens possessing prescribed residential and other qualifications; [4] the Mayor, subject to confirmation by the City Council, is to appoint the Commissioners and "[t]he City Council shall have authority to fix and prescribe the salaries to be paid to said Commissioners" [5] and the Council is given power to remove any commissioner.[6] Commissioners so appointed "shall have full and complete authority to manage, operate, improve, extend and maintain the municipal airport" including the right to employ and discharge employees, "it being the intention of this Act * * * to vest in said Commissioners unlimited authority to operate, manage, maintain, improve and extend said *municipally owned* airport * * *." [7] Cities qualifying under the Act are authorized to finance improvements of airport facilities, including but not limited to the "issuance of bonds, borrowing money, allocation of other available municipal funds * * *." [8] The Commissioners are required to keep a record of all revenues and expenditures,

and submit "monthly reports to the Mayor and City Council, * * * " and furnish "such other and further reports, data and information as may be requested by the Mayor or City Council"; [9] the Commissioners are to submit to the city annually "before the city prepares its budget, the amount of funds necessary for maintenance, operation, and management, of the *municipal airport* * * * above the estimated revenue and the funds remaining on hand"; [10] the Commissioners are to meet at least monthly, but other meetings may be held at any time by the Board, "or upon the call of the Mayor and City Council." [11] Upon appointment of Commissioners, the Mayor and City Council are to do all things necessary "to vest *complete charge*" of the municipal airport in the Commissioners.[12] In any qualifying city "owning and operating a municipal airport * * * *by or through* a Board of Airport Commissioners," the Commissioners are authorized to set up social security plans for employees of the airport.[13]

From our analysis of the Act, it seems clear that it is designed to authorize a delegation of management powers by the city and that a Commission created pursuant to the Act is not a separate corporate entity, but an agency of the city with power and authority to operate, manage, maintain and improve a "municipally owned airport." As far as we have been able to determine wherever it has been the purpose of the legislature of the State of Arkansas to authorize the creation of a commission with authority to proceed independently of the municipality, the legislature has employed explicit language so providing. Of particular comparative interest is the Arkansas "Housing Au-

---

3. Section 74–502 (All statutory references are to Arkansas 1947, Annotated, 1957 Replacement).

4. Section 74–503.

5. Section 74–504.

6. Section 74–505.

7. Section 74–506.

8. Section 74–507.

9. Section 74–513.

10. Section 74–514.

11. Section 74–515.

12. Section 74–516.

13. Section 74–518.

thorities Act" § 19–3001 et seq. Ark. Stats.1947 Anno. 1956 Replacement, wherein the Authority is endowed with all of the attributes of a municipal corporation. Thus, in § 19–3011, it is expressly provided:

"An authority shall constitute a public body corporate and politic, exercising exclusively public and essential governmental functions, * * * —including the following powers in addition to others herein granted:

"(a) To sue and be sued; to have a seal and to alter the same at pleasure; to have perpetual succession * * *.

"(b) Within its area of operation: to prepare, carry out, acquire, lease and operate housing projects * * *."

By § 19–3015, the Housing Authority is given the power of eminent domain, in contrast to § 74–508 of the Airport Act which states that "the *city* is expressly authorized to have all the rights of eminent domain." By § 19–3017, the Housing Authority is given power to issue bonds "for any of its corporate purposes." As we have seen, under the enabling Airport Act, § 74–507, that power remains in the city.

Neither of the parties has favored us with authorities to support their respective positions, and apparently they were content to cite the Act itself and Arkansas Statutes providing for creation of other Commissions and Boards. While not undertaking an examination of similar statutory provisions of other states, we have researched the question sufficiently to satisfy us that our interpretation of the Arkansas Act does not run counter to recognized general principles which relate to the subject.

Rhyne, in his treatise on Municipal Law (1957 Ed. Nat'l Institute of Municipal Law Officers) states, pp. 92–93, § 6–2: "Municipal departments, commissions and boards possess those powers expressly conferred by charter, general statute, ordinance or those necessarily implied.

In the discharge of these powers, the department, commission or board acts as the agent of the municipality." See also McQuillen, "Municipal Corporations" 3d Ed., Vol. I, §§ 2.28–2.29, Vol. III, § 1103. In 62 C.J.S., Municipal Corporations, § 550, p. 1029, we find:

"'As a general rule a municipal department, in discharging a duty primarily resting on the municipal corporation, acts as an agent or instrumentality of such corporation, even though the department may have full power and authority in the particular matter. * * * A test in determining the character of a department as a corporation or like entity, which is sometimes applied, is the capacity to hold property and to sue and be sued by a corporate name."

In Greensboro-High Point Airport Authority v. Johnson, 226 N.C. 1, 36 S.E.2d 803, the statute involved expressly created the Greensboro-High Point Airport Authority as a body corporate with power, inter alia, to " 'purchase, acquire, establish, construct, own, control, lease, equip, improve, maintain, operate and regulate airports or landing fields' within Guilford County; * * * [t]o sue and be sued; to acquire by purchase lands for construction and maintenance and operation of airports * * * to make contracts and hold personal property * * *." Ibid, p. 807. The focal point in the case involved the right of Guilford County, the City of Greensboro and the City of High Point to make appropriations to the Airport Authority. In resolving this issue the court was required to consider and determine whether the Airport Authority was a true separate corporation or the agent of the Cities of Greensboro and High Point. In ruling that the Authority was an agent for the two cities, the court stated at p. 809:

"The plaintiff Airport Authority is neither a private corporation nor a political territorial subdivision. It is a quasi-municipal corporation of a type known since McCulloch v. Mary-

land, 4 Wheat. 316, 4 L.Ed. 579, and commonly used in this and other states to perform ancillary functions in government more easily and perfectly by devoting to them, because of their character, special personnel, skill and care."

Cf. also Des Moines Park Board v. City of Des Moines, 228 Iowa 904, 290 N.W. 680; Brownlee v. Dalton Board of Water, etc. Commission, 59 Ga.App. 538, 1 S.E. 2d 599.

■ Having determined that the Airport Commission was not a separate entity, we now turn to the city's second contention that the contract is invalid and not a binding obligation because it was not authorized by a resolution in writing approved by a majority vote of the City Council as required by § 19–2311 Ark. Stats.1947 Anno. 1956 Replacement. There is no contention that the city was without power to contract for construction of a municipal airport, and thus no claim is made that such a contract would be void *ab initio*. In this situation, the general rule is stated in 38 Am.Jur. Municipal Corporations § 509, p. 185:

"The general rule is that municipal corporations may ratify contracts made on their behalf which they have authority to make. Thus, it is competent for a municipal corporation to ratify a contract and thereby to make it a binding obligation, acting through its authorized agencies and in the manner prescribed by law for making contracts of such a character, if the contract was within its general corporate powers but was invalid because defectively or irregularly executed or because the officer or agent who purported to execute it on behalf of the municipality had not the requisite authority."

■ In Arkansas the rule seems to be firmly settled that a municipality cannot accept the benefits of a contract and then defend on the ground that the contract is void. Judge Miller of the Western District of Arkansas was confronted with a similar contention in Cravens v. United States, D.C.Ark., 163 F.Supp. 309, 318–320, and demonstrated very clearly in a review of numerous Arkansas cases, that a county or city may not avoid payment for benefits received under a contract on the ground of invalidity of the agreement.

■ The record is silent as to whether all preliminary statutory procedures were followed in the execution of the instant contract. However, the facts do disclose, as we have seen, that the Advertisement for Bids stated that proposals would be received by the City of Arkadelphia—the contract was between the City of Arkadelphia and the successful bidder—the bond required ran in favor of the City of Arkadelphia. Certainly it can be said that Eddy believed that it was dealing with the City of Arkadelphia and not with a Board of Commissioners without powers to issue bonds or raise monies to finance the contemplated construction. It also seems clear that the City of Arkadelphia is chargeable with notice of the Advertisement for Bids, the contract and bond. In such a situation, and with the further fact that Eddy has performed under the contract, and the city has accepted and is enjoying the benefits under such contract, it is not in a tenable position to now contest the validity of the contract executed in its name by its agent on the ground that it was not formally authorized. Law and equity dictate that the City of Arkadelphia be bound by its contract and its liabilities thereunder.

We must rule that the trial court's finding that the City of Arkadelphia is not liable on the contract was induced by an erroneous concept of the law. Accordingly, the judgment appealed from is reversed, and the cause is remanded with directions to enter judgment in favor of L. C. Eddy, Inc., and against the City of Arkadelphia in the proper amount.