E. E. TERRY, Inc. *v.* CITIES of HELENA and
WEST HELENA, Arkansas, Acting Through Helena-
West Helena Airport Commission

73-239                                    506 S.W. 2d 573

Opinion delivered March 18, 1974

*W. G. Dinning Jr.*, for appellant.

*David Solomon*, for appellee.

J. Fred Jones, Justice. The Cities of Helena and West
Helena, acting through their Airport Commission, leased
their airport land and facilities to E. E. Terry, Inc., hereafter
referred to as "Terry." The cities sued Terry for back rent
and Terry counterclaimed for damages. A jury was waived
and the trial judge sitting as a jury rendered judgment in

favor of the cities for $3,522.48 in back rent and dismissed Terry's counterclaim. Terry has appealed to this court under assignments of error as follows:

"The lower court erred in overruling appellant's motion to dismiss the complaint on the grounds that the new Helena-West Helena Airport Commission had no legal entity or authority to maintain the action under the lease.

The court as a trier of fact disregarded the undisputed testimony and dismissed appellant's cross-complaint.

(A) Appellee had no right to reenter and take possession of leased property to the damage of the appellant.

(B) The appellee had no right to withhold the making of repairs customarily made by the appellee's predecessor in office over a period of more than 20 years."

The background for this litigation began in 1940 when the Cities of Helena and West Helena, by municipal ordinances, jointly created the Helena-West Helena Airport Commission with authority to acquire, develop, maintain and operate a public airport for the two cities. The ordinances provided that the Commission should consist of six members, including the mayor and two citizens of each of the municipalities. The commissioners under authority of these ordinances acquired a section of land and established airport facilities thereon. It appears that soon after the establishment of the airport, it was used by the federal government as a training facility for pilots during World War II and in connection with such use, several frame and metal buildings, including a mess hall, recreation building, and barracks buildings were erected in addition to the hangars for airplanes. It appears that after the war the government returned the property to the two cities and the facilities were used for a time as a training school under the authority and management of the Airport Commission as originally composed.

For a number of years prior to 1966 the entire section of

land, including the airport with its building and facilities, was leased to Terry who operated the airport, used and sublet the buildings as well as the farmland outside the airport area. The final lease to Terry, and the only one involved in this case, was dated May 26, 1966, and was for a future two year term beginning on January 1, 1968, and ending on December 31, 1971. Under the terms of this lease Terry agreed to pay $15,000 per year in quarterly installments of $3,750 to be paid in advance on the first days of January, April, July and October of each year. As to the property included in the lease, it was described as follows:

"A) All buildings, barracks, hangars and storage facilities used in the operation of the Thompson-Robbins Field situated in Section 27, Township 1 South, Range 4 East, Phillips County, Arkansas, as per description and list attached hereto and designated as Schedule 'A.'

B) Agricultural lands not presently used for airport facilities and being described as all the remaining lands situated in said Section 27, Township 1 South, Range 4 East, Phillips County, Arkansas."

Schedule A, above referred to, specifically described several buildings as to size and use including a "Mess and Recreation Building 97' x 133' " used as a "Woodwork Shop."

The lease contained 13 separately numbered paragraphs, but the only ones pertinent to the case before us are paragraphs 9 and 11, which read as follows:

"9) It is mutually agreed that Lessee shall have the right to make original structural changes in the buildings located on the leased premises, so long as the same shall be beneficial to the structures, and shall not decrease the value thereof.

11) It is mutually agreed that should the improvements on said property or any of them be rendered unfit for occupancy for the purposes for which they are hereby let, by fire, windstorm, or other unavoidable casualty, the rental hereinabove stipulated to be paid by the Lessee,

or such proportion thereof as may be in the circumstances just, shall be by said Lessor remitted and abated until such time as the same shall have been repaired and again put in condition for such occupancy by the Lessor."

Under a supplement to the lease Terry was appointed "manager" and was charged with the responsibility of managing the airport facilities in regard to its operation for the members of the public who would have occasion to use the airport. The lease was completely silent as to repairs and maintenance of the buildings and improvements except as above set out.

On March 7, 1968, the two cities passed new ordinances reorganizing their airport commission under the authority of the 'Airport Commission Act," Act 53 of 1949, Ark. Stat. Ann. § 74-501 et seq. (Repl. 1957). The 1968 ordinances provided a five member commission and eliminated the mayors of the two cities from membership on the commission, as required under the Act, § 74-503. The new Commission took over the active management and operation of the airport facilities upon passage of the new ordinances and was so acting when the present litigation was instituted. No separate ordinances were passed by the two cities abolishing the Commission as constituted under the 1940 ordinances, but the 1968 ordinances repealed all ordinances in conflict with them.

Beginning with the installment due on January 1, 1969, Terry reduced the quarterly payments to $3,500 and upon termination of the lease, the cities, through the Airport Commission, filed suit for the remainder of the agreed rent in the amount of $3,000, together with interest and costs. On October 19, 1971, Terry filed answer admitting the execution of the lease agreement but denying that the court had jurisdiction because the Airport Commission lacked capacity to sue. As a counterclaim, Terry alleged that in October, 1968, the Commission entered on the leased premises and removed the mess and recreation building used as a woodwork shop; that from, and after, January 1, 1969, the Commission refused to make ordinary repairs to the buildings on the leased premises and because of such lack of repairs, the buildings deteriorated

and became worthless, all to Terry's damage in the amount of $7,200 for which Terry prayed judgment. Answer was filed to Terry's counterclaim on November 3, 1971, and on May 3, 1972, Terry filed what was designated "Motion to Dismiss" alleging that the lease dated May 26, 1966, was one of a series of leases over a period of about 25 years; that the 1966 lease was entered into by the Commission created under the 1940 ordinances; that the 1940 ordinances were not repealed prior to the passage of the 1968 ordinances, and that the Commissioners selected under the 1968 ordinances had no legal authority to maintain suit in connection with the lease described in the complaint. The trial court overruled Terry's motion to dismiss and following trial on the merits, rendered judgment against Terry for past due rent, together with interest as already stated, and dismissed Terry's counterclaim.

We now consider Terry's assignments of error in the order they are designated. The objection that plaintiff did not have legal capacity to sue must be made in a manner provided in the statute. *Gaither Coal Co.* v. *LeClerch*, 182 Ark. 466, 31 S.W. 2d 750. Ark. Stat. Ann. § 27-1115 (Repl. 1962) provides that where it appears on the face of the complaint that a plaintiff has no legal capacity to sue, the defendant may demur to the complaint; but, where incapacity to sue does not appear on the face of the complaint, the objection may be taken by answer (§ 27-1119). Terry first raised the objection in the answer to the complaint and if the later motion to dismiss was to be treated as a demurrer, it was filed long after the answer and counterclaim was filed. We find no merit to Terry's first assignment. Terry seems to recognize that this was a suit by the city through its agency, the Airport Commission. See *I. C. Eddy, Inc.* v. *City of Arkadelphia*, 303 F. 2d 473. The new Commission was at least a de facto commission insofar as Terry was concerned and Terry was in no position to question its existence or authority to sue as an agency of the cities under the ordinances creating it. In *Pennington* v. *Oliver*, 245 Ark. 251, 431 S.W. 2d 843, we cited the earlier case of *Faucette, Mayor* v. *Gerlach*, 132 Ark. 58, 200 S.W. 279, where this court said:

" 'A person who enters into an office and undertakes the performance of the duties thereof by virtue of an election

or appointment, is an officer *de facto,* though he was ineligible at the time he was elected or appointed, or has subsequently become disabled to hold the office. Indeed, it is settled by a current of authority almost unbroken for over 500 years in England and this country, that ineligibility to hold an office does not prevent the ineligible incumbent, if in possession under color of right and authority, from being an officer de facto with respect to his official acts, in so far as third persons are concerned.'"

The trial court did not err in overruling Terry's motion to dismiss the complaint.

As to Terry's second point, Mr. Loyall Barr testified that he had been serving as a member of the Airport Commission since his appointment in April, 1968. After testifying as to the amount of arrears in rent owed by Terry in the amount of $3,-000, he said that when he assumed his duties as commissioner, the airport facilities included the hangars and some temporary buildings formerly used by the old flying school and so far as he knows they were all habitable. He said the mess hall became unusable because of general deterioration and the Commission, under authority from the city council, authorized its removal because of its unsightly appearance and hazard to the property. He said that according to the minutes of Commission meeting for July 29, 1968, one of the commissioners was directed to get someone to tear the old mess hall building down at no cost; that Mr. Terry was present at that meeting and made no objections to the proposal and the building was actually torn down and removed within the next three months following that meeting. He said that when he first became a commissioner the building was occupied by Mid-South Wood Craft as a tenant of Terry, but he does not know how long the building remained occupied. He said that some repairs were made on the hangars, and that a few repairs were originally made on some of the other buildings but that the Commission decided that it was a waste of taxpayers' money to repair them.

Mr. Buron Griffin testified that he was appointed chairman of the new Airport Commission in April, 1968, and has served in that capacity since then. He said that when he took

office as a commissioner, the old prefabricated barracks buildings were all in a bad state of repairs. He said the mess hall in question had been occupied by Mid-South Wood Craft but it moved out of the building sometime prior to April, 1968, and when the decision was made to tear the building down, the roof had fallen in simply from deterioration, leaks, etc. He said there had previously been a fire in the boiler room and shed attached to the building. He said that when he took office in April, 1968, some of the buildings were being used for the storage of farm machinery and hay and some of them were propped up. He said Terry never did make any demand on him or the Commission to make repairs on the buildings, and made no objections to tearing the mess hall down and removing it from the premises after its roof had fallen in. He said that all of the old buildings had been torn down during 1971 and 1972, and the old chapel building was the only one of the original buildings, besides the hangars, that was left. He said the old chapel building had been repaired by the OES at no expense to the Commission or Terry; that OES paid rent to Terry on that building in the amount of $75 per month. He said that so far as he knows the Commission never did make any repairs on the old barracks buildings but did make repairs on the hangars. He said that when he assumed his place on the Commission, a boiler house was originally attached to the mess hall building but that it had completely burned down before he assumed his duties on the Commission. He said the boiler room fire had nothing to do with the roof caving in on the mess hall. He said that when the mess hall building was removed, one-fourth of its entire roof near the middle of the building had fallen in and the building was vacant when this occurred. He said it would have been economically unfeasible to attempt to repair the mess hall building.

Mr. E. E. Terry testified that he has operated E. E. Terry, Inc. since 1945 and was previously engaged in air student training, airplane sales and service, agriculture and flying. He said at one time he operated 200 planes all over the United States but that he only owns three now which he uses for pleasure. He said that between 1968 and 1971 he operated 75 or 80 planes out of the West Helena Airport. He said that he had been leasing the airport facilities since 1945 and that some of the barracks buildings were converted to apartments

which he rented. He said that his leases had run for five year periods until 1966 when he leased the premises for a period of four years, ai ! the 196  lease w?s to take effect on the expiration of the one he was then operating under. He said he had possession of the mess hall building during the entire term of his lease until it was torn down in 1968 or 1969, by the new Commission soon after its members took office. He said that the Commission members did not discuss with him their intention of tearing the building down. He said that they did discuss such plans and intentions at a meeting he attended but he "had no say-so as to what they were going to do." He said he was "not asked." Mr. Terry then testified as follows:

"Q. What was the rental value that you collected on this particular building for the last tenant?

A. $75 a month.

Q. And approximately when did he move out?

A. Sometime after this new Commission came on.

Q. And how long had it been vacant?

A. It had been vacant, I reckon, a couple months.

Q. Did you know anything about a fire in the boiler room?

A. It was not a boiler room. It was a sawdust room out from the main building where they blew their sawdust, and there was a pump in there. It was not connected with this building at all. The temporary building had been put up by the sawmill man to pump his sawdust in.

Q. Do you know anything about the roof falling in on this mess hall?

A. Not at that time, no, sir.

Q. After the man had moved out of this building, did you have it for rent?

A. It would have been up for rent, yes, sir.

Q. And for how much?

A. $75 a month.

Q. Mr. Terry, talking about the barracks, what were the conditions of the barracks during this period of this new lease?

A. Well, they got in such shape that I couldn't rent them, finally. They were in fair shape at the beginning of the lease, but then they just deteriorated down to where they were no good.

Q. Were people moving out?

A. Yes, sir.

Q. Were you able to rent them?

A. No, sir.

Q. Did you request from any member of the Commission, or any Commission meeting, or anyone, for repairs of some kind to make on these barracks buildings?

A. I did, but I was given the understanding that they were not going to make any repairs on the buildings. That was out of the question."

Mr. Terry then testified as to his income from rents on the buildings. He said that because of the deterioration of the buildings a tenant would move out and another one would move in until finally he was unable to rent them at all. He said that he made no repairs on the buildings during the period of his last lease.

On cross-examination Mr. Terry admitted there was nothing in his lease indicating who should make repairs on the buildings and he then testified as follows:

"Q. . . . At these meetings that you attended, did you

ever express your opinion about anything?

A. Yes, sir.

Q. You weren't just a vegetable sitting there listening to what these profound commissioners said, were you? You expressed yourself, did you not?

A. Sometimes I did, yes, sir.

Q. Did you express yourself about these buildings?

A. I asked to have them repaired.

Q. And that's all you did?

A. Yes, sir.

Q. And did you discuss whether it was economically feasible to repair them?

A. No, I don't know as I went into that detail about it or not.

Q. Now, these buildings had been there since 1941, or thereabouts, had they not?

A. That's right.

Q. And they were temporary buildings at that time, were they not?

A. I suppose you would call them temporary.

Q. Now, these buildings were just a small part of what we rented to you, that is the wooden buildings, is that right, under the lease?

A. What do you mean?

Q. Well, you got 500-odd acres of agricultural land you were renting?

A. Yes, sir."

Mr. Terry then testified that he ceased operating the airport facilities in 1970 because in July, 1970, he subleased the airport facilities to Alder-McCarty Flying Service who took over the operation and that he believes he was receiving from the sublessee the same amount ($14,000) he was paying on his lease.

It is clear from the testimony of the commissioners that the prefabricated buildings including the mess hall in this case were hastily placed on the property in the early 1940's and had deteriorated to the point that some of them had been propped up and the roof had falled in on the mess hall building at the time it was torn down. According to all the testimony, meetings were held by the Commission for discussion and determination of what was to be done with the buildings and although Mr. Terry admits he was present at at least one such meeting, he said that his opinion was not asked for and he had no "say-so" and did not agree to the removal of the building and was not asked concerning its removal. According to Mr. Terry's testimony, however, he did at several of these meetings insist that the buildings be repaired. Of course, a trial judge's decision, when sitting as a trier of facts, has the same binding effect and verity as a jury verdict and on appeal to this court we are only concerned with whether or not there was any substantial evidence to support the judgment. *Zullo v. Alcoatings, Inc.*, 237 Ark. 511, 374 S.W. 2d 188.

It is clear that the 1966 lease agreement in the case at bar made no mention of the lessor's duty to make repairs. It is well settled in Arkansas that unless a landlord agrees with his tenant to repair leased premises, he cannot, in the absence of statute, be compelled to do so or be held liable for repairs. *Delaney v. Jackson*, 95 Ark. 131, 128 S.W. 859; *Rundell v. Rogers*, 144 Ark. 293, 222 S.W. 19. The evidence is clear that the damage to buildings was occasioned by deterioration over the years and there is no substantial evidence that they were damaged by fire, windstorm or other unavoidable casualty within the meaning of paragraph 11 of the lease, *supra.* We conclude that there was substantial evidence to sustain the

judgment of the trial court and that the judgment must be affirmed.

The judgment is affirmed.