Katherine THOMAS, Individually and As Parent
and Next Friend of Tamarius Thomas, A Minor
*v.* Ray STEWART and Charter Enterprises

01-259

60 S.W.3d 415

Supreme Court of Arkansas
Opinion delivered November 29, 2001

*Gary Eubanks and Associates*, by: *Russell D. Marlin*, for appellant.

*Huckabay, Munson, Rowlett & Tilley, P.A.*, by: *Julia L. Busfield* and *John E. Moore*, for appellee.

TOM GLAZE, Justice. Katherine Thomas brings this appeal from the trial court's order granting summary judgment in favor of defendant Ray Stewart. In addition, she asks us to overrule the doctrine of caveat lessee in Arkansas.

Appellant Thomas and her son, Tamarius Thomas, were tenants in an apartment building that was at some point owned by appellee Ray Stewart.[1] Thomas's sister, Anita Benton, was also a

---

[1] Ray Stewart, d/b/a Charter Enterprises, Inc., was the named defendant in this suit. However, as will be discussed *infra*, Stewart apparently sold the apartment building to Gordon Reese in 1996. For unknown reasons, Reese is most often referred to as Stewart's employee

tenant in that same apartment building. In January of 1998, as Tamarius was leaning on a second-floor balcony railing between the apartments of Thomas and Benton, the railing gave way. Tamarius fell to the ground and suffered numerous injuries. Thomas filed suit against Stewart on December 28, 1999, alleging that Stewart or his employees were responsible for the railing that collapsed, that Stewart failed to inspect his premises in such a manner as to keep them in a reasonably safe condition, and that he failed to maintain the premises in such a way as to assure that they were in a reasonably safe condition.

Stewart answered, asserting that he was under no legal obligation to the Thomases for Tamarius's injuries, sustained in a common area of the apartment complex, absent a statute or an agreement. Shortly thereafter, Stewart moved for summary judgment, asserting that neither Thomas nor Benton had a written lease with him. Further, he argued that under Arkansas law, a landlord is under no legal obligation to a tenant or a tenant's guest for injuries absent a statute or express agreement. While he conceded that he provided some maintenance to the property, Stewart stated he did not expressly agree to assume the duty to inspect the property, remove hazards, or insure the safety of the tenants or their guests. Further, he averred that he had never made any repairs or alterations to the balcony railing at issue prior to the accident.

Thomas responded to Stewart's motion for summary judgment by arguing that the balcony railing had a latent defect that made it dangerous. Thomas contended that Arkansas should recognize a rule, as other jurisdictions have, by which a latent defect renders a landowner liable when injuries proximately result from such a defect. Further, Thomas suggested that Arkansas should adopt a rule that once a landlord has assumed a duty by conducting maintenance or by warning that he would continue to do so, he is liable when injuries proximately result from his failure to do so. Thomas attached deposition excerpts in which she had stated that Gordon Reese, the maintenance man for the apartment complex, had come to her apartment to fix things, like the plumbing or the air conditioner. Thomas's deposition also reflected that Anita Benton, her sister, had told her that the railing was loose and that she (Benton) had informed Reese about that problem before the accident. Both Thomas and her son said that, prior to the accident, they had no idea the railing was loose. Thomas also attached deposition excerpts

and Stewart is referred to as the owner or landlord.

from Benton; Benton stated that, long before Tamarius's fall in January of 1998, she had complained to Gordon Reese about the balcony being loose, and that Reese told her that he would check the railing or get someone to check and fix it. This deposition testimony, Thomas asserted, presented a genuine issue of material fact as to the landlord's knowledge of the problem, thus rendering summary judgment inappropriate.

After a hearing, the trial court entered an order granting Stewart summary judgment. In that order, the court found the following: 1) there was no written lease between Thomas and Stewart or between Benton and Stewart; 2) there was no express agreement between Stewart and Thomas or Benton relating to repairs, inspection, or maintenance of the property; 3) there is no statute in Arkansas imposing a duty on a landlord to inspect or maintain the leased premises in a safe manner; 4) Thomas failed to prove that Stewart assumed the duty to inspect the leased property, remove hazards, or insure the safety of the tenants or their guests; 5) Thomas failed to establish that any defects in the railing were latent defects, or unknown to the tenant; 6) Benton had full knowledge of the alleged defects, and Tamarius was her guest; 7) Arkansas has adopted the doctrine of caveat lessee, and has done so for over 100 years; and 8) Stewart had not negligently performed any repairs. Therefore, the court granted Stewart's motion for summary judgment.

■■ On appeal, Thomas continues her argument that there are issues of fact that render summary judgment inappropriate. We have, of course, ceased referring to summary judgment as a "drastic" remedy. *See Wallace v. Broyles*, 332 Ark. 189, 961 S.W.2d 712 (1998) (supp. opinion on denial of reh'g in *Wallace v. Broyles*, 331 Ark. 58, 961 S.W.2d 712 (1998)). We now regard it simply as one of the tools in a trial court's efficiency arsenal; however, we only approve the granting of the motion when the state of the evidence as portrayed by the pleadings, affidavits, discovery responses, and admissions on file is such that the nonmoving party is not entitled to a day in court, *i.e.*, when there is not any genuine remaining issue of material fact and the moving party is entitled to judgment as a matter of law. *Id.* The purpose of summary judgment is not to try the issues, but to determine whether there are any issues to be tried. *BPS, Inc. v. Parker*, 345 Ark. 381, 47 S.W.3d 858 (2001). However, when there is no material dispute as to the facts, the court will determine whether "reasonable minds" could draw "reasonable" inconsistent hypotheses to render summary judgment inappropriate. In other words, when the facts are not at issue but

possible inferences therefrom are, the court will consider whether those inferences can be reasonably drawn from the undisputed facts and whether reasonable minds might differ on those hypotheses. *Flentje v. First National Bank of Wynne*, 340 Ark. 563, 11 S.W.3d 531 (2000).

In support of her argument that summary judgment was inappropriate, Thomas cites *Hurst v. Feild*, 281 Ark. 106, 661 S.W.2d 393 (1983). In that case, a gas station was leased to Texaco, Inc.; under the terms of the lease to Texaco, the owner agreed to make major repairs over $50.00. Texaco, in turn, subleased the station to Leon Hurst, who was the proprietor of the station during a time when a stone facade was constructed on the building. In November of 1978, Texaco subleased the station to Troy Coleman, who subsequently entered into an oral sublease with Hurst, who remained on as proprietor. The subleases executed by Texaco to Hurst and to Coleman contained an agreement that the lessee would maintain the station in good repair and in a safe condition, but the terms of the oral sublease to Hurst were in question.

In January of 1980, a portion of the stone facade collapsed, injuring Hurst. Hurst, as sublessee, sued for personal injuries against the owners, lessor (Texaco), and sublessor (Coleman). The trial court found that the duty to repair rested on Hurst, and granted summary judgment in favor of the defendants. On appeal, this court reversed as to sublessor Coleman, noting as follows:

> At common law the lessor owed no duty of repair of the premises to the lessee. Arkansas law follows this rule. Unless a landlord agrees with his tenant to repair the leased premises, he cannot, in the absence of statute, be held liable for repairs. *Terry v. Cities of Helena & W. Helena*, 256 Ark. 226, 506 S.W.2d 573 (1974); *Collison v. Curtner*, 141 Ark. 122, 216 S.W. 1059 (1919).

> In the instant case, the lease agreements made between the owners and Texaco, Inc. and between Texaco, Inc. and Coleman are not applicable to the lease between Coleman and Hurst because of a lack of privity. Therefore, the only question is whether the terms of the oral sublease from Coleman to Hurst imposed upon Coleman a duty to repair. *Appellant Hurst's affidavit was that Coleman agreed to make repairs and that Coleman told Hurst to call him if any repairs were needed. This is sufficient to raise a question of fact.* (Emphasis added.)

*Id.* at 108; *see also Majewski v. Cantrell*, 293 Ark. 360, 737 S.W.2d 649 (1987) (court held there was an agreement to repair where lessor admitted having sent a worker out to repair roof on numerous occasions).

Here, Thomas asserts that a similar situation exists. She points to Anita Benton's deposition testimony, wherein Benton stated she informed Gordon Reese about the balcony railing being loose prior to Tamarius's fall, and that Reese, as an employee of Stewart, told her he would either fix it or call someone to fix it. Thomas also points to her own deposition testimony where she averred that it was Reese with whom she entered into the oral lease for the apartment, and that Reese was the one responsible for making repairs to the apartments. Reese admitted that he was responsible for the maintenance of the buildings and their railings. Thomas contends that these statements were sufficient to raise a question of fact about whether or not Reese, as an employee of Stewart, entered into an oral agreement to make repairs to the premises.

We agree that there are questions of fact, if for no other reason than because we believe there is a question as to the role and authority of Gordon Reese. Simply put, there are disputed facts surrounding Reese's responsibility and authority concerning the apartment building. Stewart's motion for summary judgment refers to Reese as the "owner of the apartments," and Reese's deposition testimony, attached to that motion, reflects that he purchased the apartments in 1996, long before this incident occurred in January of 1998. In that same deposition, Reese also acknowledges that he was responsible for the maintenance of the buildings and the railings outside them. Further, Thomas attached her own deposition testimony to her response to the initial summary judgment motion; after noting that she never had to sign a written lease, she averred that it was Reese who informed her she could have the apartment and that she had always believed Reese to be the owner of the apartments.

Notwithstanding these foregoing statements, however, counsel for Thomas asserted that Reese was only an "agent, servant, or employee" of the named defendant, Ray Stewart. Further, Thomas's attorney argued that "the defendant, through its agent, servant, or employee Gordon Reese," assumed the duty of maintaining the buildings. Defense counsel never cleared up the issue of Reese's capacity or role, and the trial court, in ruling on the motion, also referred to Reese as "the agent." The court also

phrased the issue as being whether there was an assumption of duty, and asked, "where did this person, Reese, get that authority from?"

Thus, it is apparent that there is a great deal of confusion surrounding Reese's status and his authority in this case. Indeed, at oral arguments before this court, counsel for appellee Stewart acknowledged that she did not focus on Reese's role because she "[did] not want to say there is a fact issue," and she conceded that if Reese's authority mattered, "then we would lose." Nevertheless, Stewart's counsel asserted that even if Reese did have authority, the contentions raised by Thomas were not allegations of an agreement by Reese to fix the railing, but were merely allegations that Benton had complained about the railing.

■ In support of this argument, Stewart argues that the situation is not akin to that presented in *Hurst*, but instead approximates more closely the facts in *Stalter v. Akers*, 303 Ark. 603, 798 S.W.2d 428 (1990). There, a third party, Mrs. Akers, was injured on the property of Jason and Laura Howard, who rented their house from Patsi Stalter. As Akers left the Howard's house, she tripped and broke her leg on a concrete block that had been placed as a temporary substitute for a broken step. Akers knew that the bottom step had been broken, and she testified that she had overheard a conversation in which Stalter, the lessor, had told Laura Howard that she (Stalter) would repair the broken step. Although the jury found in Akers's favor, this court reversed. Noting that there was evidence that Akers overheard a conversation between Stalter and Howard about fixing the defective step, this court nevertheless held that "a gratuitous promise to repair, unsupported by consideration, is not sufficient to impose upon the landlord a duty to carry out the promise." *Stalter*, 303 Ark. at 607.

■ The *Stalter* court further noted that, although the Restatement (Second) of Torts § 357 provided that a lessor is subject to liability for physical harm caused to his lessee by a condition of disrepair if the lessor has contracted by a covenant in the lease or otherwise to keep the land in repair, the comment to that section also stated that "th[is] rule has no application where there is no contractual obligation, but merely a gratuitous promise to repair, made after the lessee has entered into possession." *Id*. Thus, holding that an injured third party must establish a landlord's contractual duty to repair a defect in the premises before he may recover for an injury suffered upon leased property over which the landlord has relinquished possession and control to a tenant, this court reversed the jury's verdict. *Id*.

██ Relying on *Stalter*, the appellee argues that the statement by Reese that he would fix the railing outside Benton's apartment amounted to nothing more than a gratuitous promise to repair, unsupported by consideration. We disagree. We first point out that the *Stalter* case, citing the *Hurst* and *Majewski* decisions, consistently recognized the rule that where it was shown that a sublessor (or lessor) agreed to make repairs, such was sufficient to raise a question of fact regarding duty. However, the trial court in *Stalter* was reversed because it gave an inappropriate jury instruction that failed to reflect that a gratuitous promise to repair, without consideration, is not sufficient to impose upon the landlord a duty to carry out the promise. The present case is a summary judgment one, and the issue, among others, to be developed is whether Stewart's agreement involved a gratuitous promise. Thomas says it did not, arguing that Stewart's (or Reese's) agreement to repair involved consideration because the agreement was made during the parties' month-to-month oral lease. In any event, this issue is yet another issue to be tried, addressed, and decided on remand, in addition to the factual question of Reese's role and authority to make a promise in the first instance.

██ Thomas also argues that this court should take this opportunity to reexamine the doctrine of caveat lessee, which has been the rule in this state for over one hundred years. *See Haizlip v. Rosenberg*, 63 Ark. 430, 30 S.W. 60 (1897). While we do not foreclose the possibility of considering this issue in the future, we decline to address the question further here for several reasons. First, we point out that, although Thomas urges the court to overrule a long line of cases, including *Propst v. McNeill*, 326 Ark. 623, 932 S.W.2d 766 (1996), her brief fails to provide the court with any authority on the issue of caveat lessee beyond a New Hampshire case, *Sargent v. Ross*, 308 A.2d 528 (N.H. 1973), which was addressed and rejected in *Propst*. Further, Thomas has not apprised the court of any developments since this court decided *Propst* that would cause us to decide the case any differently. In *Propst*, we noted that the question of landlord liability was more properly a question for the General Assembly, stating that, "because of the policy considerations and possible impact that would ensue in enlarging a landlord's liability, there is merit in the argument that such matters might be dealt with better in the legislative arena." *Propst*, 326 Ark. at 626. Thomas has not provided the court with any indication that the General Assembly has taken any action on this issue, and in the absence of any such research or authority, we are hesitant to address the matter here.

■ Finally, Thomas also argues that the doctrine of caveat lessee can be analogized to that of caveat emptor, which this court addressed and modified in the context of the sale of new houses in the case of *Wawak v. Stewart*, 247 Ark. 1093, 449 S.W.2d 922 (1970). Thomas contends that because the court swept away an "old world caveat related to real property" in *Wawak*, we should take the opportunity to do so here with respect to caveat lessee. We decline to adopt this reasoning. Although Thomas asserts that we should simply adopt a more modern rule, as the court did in *Wawak*, we point out that this court, in that case, had the benefit of *amicus curiae* briefs from interested organizations; such briefs had been invited after the case was submitted in order to ensure that the court would have before it all possible persuasive arguments before overturning long-standing precedent. Without the benefit of such research and argument in this case, we simply do not believe we are in the best-informed position to make relatively sweeping changes to our common law.[2]

■ Because the trial court improperly concluded that there were no genuine issues of material fact, we reverse the order granting summary judgment against Thomas and remand the case for further proceedings.

IMBER, J., not participating.

BROWN, J., concurs.

R OBERT L. BROWN, Justice, concurring. Like the majority, I am reluctant to consider such a sweeping change in our common law as completely abandoning the doctrine of caveat lessee for landlords without fully developed facts and briefing accompanied by appropriate *amicus curiae* briefs. I am also reluctant to consider adopting exceptions to the doctrine such as the retention-of-control and latent defect exceptions without comparable briefing.

Yet, it has been almost thirty years since the Uniform Residential Landlord and Tenant Act was first proposed in 1972. The uniform act provided that states should require residential landlords to comply with applicable building and housing codes which affect health and safety, make repairs and keep the premises in a fit and

---

[2] For similar reasons, and also because Thomas has prevailed in this appeal, we decline Thomas's invitation to adopt exceptions to the caveat lessee doctrine.

habitable condition, maintain common areas, and make available basic plumbing, water, sanitation, and utility services. *See Case Note. Propst v. McNeill: Arkansas Landlord-Tenant Law, A Time for Change,* 51 Ark. L. Rev. 575 (1998). Undoubtedly, this uniform act or some variation of it has been proposed to the General Assembly on several occasions over the past three decades, but no action has been taken by that body. This is so even though this court said in *Propst v. McNeill,* 326 Ark. 623, 626, 932 S.W.2d 766, 768 (1996), that because of the policy considerations inherent in the issue of land-lord liability, "there is merit in the argument that such matters might be dealt with better in the legislative arena." Three legislative sessions have occurred since the *Propst* decision, but, again, no action has been taken.

Because the General Assembly has not seen fit to act on this issue, it is appropriate that this court revisit the issue of landlord liability at the next appropriate opportunity. On two occasions in the last decade, justices of this court have shown a willingness to limit the rule of caveat lessee or adopt one of the exceptions to it. *See Eoff v. Warden,* 330 Ark. 244, 953 S.W.2d 880 (1997) (Newbern and Corbin, JJ., dissenting on basis that retention-of-control exception should be considered); *Bartley v. Sweetser,* 319 Ark. 117, 890 S.W.2d 250 (1994) (Newbern, J., concurring on basis that landlord-tenant relationship is a special relationship giving rise to a duty of care).

In the past when the General Assembly has refused to act, this court has made a significant change in its common law. *See, e.g., Parish v. Pitts,* 244 Ark. 1239, 429 S.W.2d 45 (1968). In *Parish,* the issue was tort immunity for political subdivisions. Because the General Assembly had refrained from addressing the issue, though called upon to do so by this court in *Kirksey v. City of Fort Smith,* 227 Ark. 630, 300 S.W.2d 257 (1957), we abolished tort immunity for political subdivisions in the *Parish* decision. We acted similarly in *Shannon v. Wilson,* 329 Ark. 143, 947 S.W.2d 349 (1997) (alcohol vendor's liability for selling alcohol to minors may be submitted to jury on issue of whether sale was proximate cause of resulting injury); *Jackson v. Cadillac Cowboy, Inc.,* 337 Ark. 24, 986 S.W.2d 410 (1999) (alcohol vendors owe duty of care to intoxicated persons, knowing they will drive a motor vehicle). In both cases, we had previously urged the General Assembly to meet the issue of dramshop liability head-on, and no action was taken. It was only after those two decisions were handed down that legislation was enacted. *See* Act 1596 of 1999, now codified at Ark. Code Ann. § 16-126-101 to 106 (Supp. 2001).

The issue of landlord liability for negligence to guests and tenants deserves attention either by the General Assembly or, failing that, by this court.