2012 Ark. App. 642

**HUBER RENTAL PROPERTIES, LLC, Appellant**

v.

**Chase ALLEN and Kristi Allen, Appellees.**

**No. CA 12–255.**

Court of Appeals of Arkansas.

Nov. 7, 2012.

---

Briner Law Firm, by: Jonathan Huber, for appellant.

Richard Holiman, for appellees.

DOUG MARTIN, Judge.

Huber Rental Properties, LLC (Huber), appeals from an order of the Clark County Circuit Court dismissing its complaint against appellees Chase and Kristi Allen. Huber filed its complaint against the Allens on July 26, 2011, seeking collection of rent and damages. The complaint alleged that the Allens had entered into a twelve-month written lease agreement with Huber on May 16, 2011, but failed to pay their rent due on July 1, 2011. The complaint further stated that the lease had been accelerated for the remainder of the term of lease for nonpayment, and Huber also sought late fees and costs associated with maintenance and cleaning of the house due to the actions of the Allens.[1] Pertinent to the issues raised on appeal, the lease contained the following provisions:

8. Maintenance: Please make request for repairs or maintenance to Lessor between 8 a.m. and 5 p.m. Monday through Friday.... PLEASE CALL IMMEDIATELY IN CASE OF AN EMERGENCY.... In the event of an emergency, please contact the Lessor as soon as possible. No charge is made for maintenance and repairs unless caused by negligence or abuse by the tenant, other residents, or guests.

10. Upkeep of Premises: Lessee shall keep and maintain the premises in a clean and sanitary condition at all times, and upon the termination of the tenancy shall surrender the premises to Lessor in as good condition as when received, ordinary wear and damage by the elements excepted. It is expected that the lessee will mow the grass as necessary in a timely manner. Failure to do so will result in up to a $75 per occurrence fee. (Not applicable for apartment complexes.) Cars are to be parked in designated areas only and not on the lawn. A $25 fine will be assessed for each violation.

The matter proceeded to a bench trial on January 12, 2012, with the Allens appearing pro se. The first witness was Kim Thornton, Huber's office manager. Thornton testified that she showed the rental house to the Allens and was present when they signed the lease for the property on May 16, 2011. Paraphrasing paragraph 10 of the lease, Thornton asserted that the lease required the tenant to keep and maintain the premises in a clean and sanitary fashion and to see to it that "the outside, the lawn, is properly taken care of." Thornton further said that, under the lease, tenants were responsible for cleaning the premises upon leaving; however, the Allens had left food in the refrigerator

---

1. The complaint was served on the Allens on September 17, 2011, and advised them that they had thirty days to file an answer. Huber filed a motion for default judgment on October 25, 2011, alleging that "more than twenty days" had passed since service of the complaint, but the Allens had failed to enter an appearance or file an answer. The circuit court denied Huber's motion on October 28, 2011, finding not only that the summons advised the Allens that they had thirty days to respond, but also that the Allens filed a pro se answer on October 14, 2011, well within that time frame.

when they moved out, and the carpets had to be cleaned. Thornton stated that the carpets had been professionally cleaned prior to the Allens' moving in, and she identified an invoice from a carpet-cleaning company that had provided that service after the previous tenant moved out on March 31, 2011. Thornton further testified that the Allens paid a $550 deposit in April and then paid rent for May and June.

Asked whether there had been "some maintenance issues" at the house, Thornton said that a tree limb had fallen down, so she called Huber's "tree guy" to come remove the limb. The limb never hit the house or damaged it in any way, and Thornton said that the tree limb was eventually cut up and removed from the driveway. As for other maintenance requests, Thornton recalled that the "plunger" inside the front door broke, but she said that it had been in working order when the Allens moved in; moreover, Thornton said, there was another entrance to the property. Thornton testified that the Allens did not pay their July rent, citing the fact that no maintenance had been done on the house. As a result of their failure to pay rent, she said, they were evicted.

On cross-examination, Thornton denied recalling a musty smell to the carpets when the Allens moved in, but she agreed she told them that if they had the electricity turned on, Huber would have the carpets cleaned. She claimed, however, that the Allens had moved their furniture in, which prevented the carpet-cleaning company from doing that work. Thornton also denied recalling being told that the frame on the front door was broken to the point that Kristi Allen, who was pregnant at the time, could not open or shut it. When asked about the garbage disposal, which the Allens alleged had flies and gnats flying in and out of it, Thornton testified that

the disposal "is not a have-to-have," although she conceded that it did need to be replaced. When asked about the tree limb, Thornton said it was "there until our tree guy could work his . . . schedule out to where he could be there."

At that point, Huber rested, and Chase Allen offered testimony on behalf of himself and his wife. Chase stated that the house smelled musty and old when they signed the lease, the sink "was a problem," and there was a large brush pile in the front yard. Chase said that Huber told him to get the utilities turned on and move in, and Huber would have the carpets cleaned. Chase and Kristi moved in, but the carpets were never cleaned. Chase also said that the garbage disposal in the sink was "messed up," with gnats and flies living in it. When the maintenance man came by to mow the yard, he looked at the sink and agreed that it needed to be fixed, and he said that he would talk to Huber about getting it fixed.

Although those were the initial problems, Chase testified that a large branch from an oak tree fell in the yard. Pictures of the "limb" showed that an extremely large portion of the tree had fallen across the driveway and reached from the front door all the way to the street. Chase asked Kim Thornton when the tree could be removed. Several weeks went by, and according to Chase's testimony, Thornton "kept saying that she's talking to Mr. Huber, it'll be done, they're getting the maintenance man out to do it." The placement of the tree was so bad, Chase said, that the mailman was unable to reach their front door for three or four weeks, so that they missed getting bills and were late paying them.

By late June, Chase told Thornton that he would just remove the tree himself and give Huber the bill; Thornton said he was welcome to have the tree removed, but

Huber would not pay for it. At the beginning of July, Chase informed Huber that, until the maintenance issues at the house were resolved, he would not pay rent. Besides the tree and the sink, Chase said that the front door frame was stuck so badly that his seven-month-pregnant wife could not open it. He agreed that there was a secondary entrance on the side of the house, but he stated that Huber had never given him keys to it. Because of that, Chase and Kristi had to leave the door unlocked at all times.

Chase explained that he felt the only leverage he had to impel Huber to perform the maintenance work was to withhold his rent, and he told Huber that as soon as the problems were fixed, he would pay the rent. Instead, on July 21, Huber served an eviction notice on the Allens.

On cross-examination, Chase examined the lease and said he "guess[ed]" there was not a provision in the lease that stated any kind of promise to repair the property. Although Chase acknowledged that the lease made the tenant responsible for upkeep of the premises, he also pointed to the language in the lease that the tenant was to surrender the property in as good condition as when received, "ordinary wear and damage by the elements excepted." Chase and Huber's counsel sparred about the condition of the sink and garbage disposal, with counsel asking whether they had ever tried simply putting a drain stopper in the sink so that the flies and gnats and smell could not get out; Chase said they had tried that, but it did not work.

Chase explained that he informed Huber that repairs needed to be done and that, if they were not performed, he would not pay rent. Chase stated that he and Kristi were going to pay the rent, saying, "I did everything that I could to—we would've paid rent the second you took care of the stuff. [But] you wouldn't come out and do anything to take care of it."

Regarding the tree limb, Chase said that, by the time he and his wife were evicted, the branch had been cut up and pushed to one side, but it still blocked half of the driveway. He acknowledged that it was substantial enough that it needed a professional tree service to remove it, but he also argued that it was unreasonable for it to have taken over a month to have the tree service called in. As to the interior of the house, Chase conceded that he did not have the carpets professionally cleaned and that he had left food in the refrigerator, although he said that was because they were in a hurry to move out.

After the Allens rested, Huber called Thornton in rebuttal.[2] Thornton said that she did not recall when she was notified about the broken door lock, but she said she went to see about it "either the first or second" Saturday after it was reported. On cross-examination, she agreed that it had taken about ten days to get the door fixed, during which time the side door had to be left unlocked because the Allens did not have a key for it. Upon inquiry by the court, Thornton explained that Huber re-keyed the front door with each new tenant and gave the new tenant a key only to the front door. When the Allens moved in, however, "it just so happened" that the side door was not re-keyed to match the front door. Thornton conceded that the Allens had never been given a key to that side door.

At the conclusion of the hearing, the court made the following findings from the bench:

---

2. Huber utterly failed to abstract Thornton's rebuttal testimony. As will be discussed below, Huber's abstract is flagrantly deficient in many respects, and it was only due to the Allens' supplemental abstract that rebriefing was not ordered.

I find that the testimony of the Defendant Mr. Allen to be credible and reasonable. I believe that Huber Rental Properties promised to have these carpets cleaned, and failed to do so.

I find that having gnats and flies coming from your kitchen sink is something that does not have to be tolerated.

I find that failure to remove the tree from the front yard in the way that was described and what the evidence shows is a material breach of the contract. A tenant should not have to live without the ability to lock a door for the period of time that was described in this testimony. And that's a material breach of this contract.

I find that the Defendant took reasonable actions to have the problems corrected, and the Plaintiff failed to comply or respond in an appropriate manner.

So the Plaintiff's complaint is dismissed with prejudice.

In its written order, entered on January 13, 2012, the court reiterated its findings that Chase Allen's testimony was "credible and reasonable," and it found in the Allens' favor "for the reasons stated to the parties in open court." Huber filed a timely notice of appeal the same day.

In its first argument on appeal, Huber asserts that the circuit court erroneously "applied a theory of implied warranty of habitability to reach its conclusions when the theory of 'caveat lessee' should have been applied." Huber asserts that, at common law, a lessor owed no duty of repair of the premises to the lessee, and it thus owed no duty to the Allens to make the requested repairs. Therefore, Huber contends, the circuit court erred in finding that it had a duty to act.

We question whether Huber preserved this particular argument for appeal. Although Huber mentioned the phrase "tenant beware" briefly during its closing arguments and suggested that there was no provision under Arkansas law that required the landlord to make repairs, the circuit court never specifically ruled on that argument, finding only that Allen's testimony was credible and that Huber's conduct constituted a material breach of the lease. Certainly, nothing in the court's findings made mention of the "implied warranty of habitability," as Huber suggests in its brief. In the absence of findings of fact or rulings on issues raised below, the argument is not preserved for appeal. *Harwell–Williams v. Ark. Dep't of Human Servs.*, 368 Ark. 183, 188, 243 S.W.3d 898, 902 (2006).

Alternatively, however, the circuit court did not err in finding that Huber owed the Allens a duty under the lease. Under the common law, Arkansas had recognized the caveat lessee doctrine for over a century. *See Propst v. McNeill*, 326 Ark. 623, 932 S.W.2d 766 (1996).[3] Under that rule, unless a landlord agrees with his tenant to repair leased premises, he cannot, in the absence of statute, be compelled to do so or be held liable for repairs. *Id.*

Here, the lease contract contained the following paragraph:

8. Maintenance: Please make request for repairs or maintenance to Lessor between 8 a.m. and 5 p.m. Monday through Friday.... In the event of an emergency, please contact the Lessor as soon as possible. No charge is made for maintenance and repairs unless caused by negligence or abuse by the tenant, other residents, or guests.

---

**3.** This principle was codified by the General Assembly in 2005 in response to the supreme court's decision in *Thomas v. Stewart,* 347 Ark. 33, 60 S.W.3d 415 (2001). *See* Reporter's Notes to Ark.Code Ann. § 18–16–110 (Supp.2011).

The lease was prepared by the lessor, and any ambiguities in the contract are resolved against the one who prepared it. *See Byrne, Inc. v. Ivy*, 367 Ark. 451, 459, 241 S.W.3d 229, 236 (2006). (Ambiguities in a written contract are construed strictly against the drafter.) Thus, we interpret this paragraph to provide that the responsibility for maintenance of the premises falls to the landlord. Why else would this provision state that maintenance and repairs, which must be requested *from the lessor,* will be paid for *by the lessor* unless the repairs are necessitated by the tenant's negligence? Because the contract contained an agreement on the part of the landlord to repair the leased premises, *see Propst, supra,* the trial court correctly concluded that Huber's conduct constituted a material breach of the lease.

In its second point on appeal, Huber argues—without citation to authority—that the circuit court's factual findings were clearly erroneous. Specifically, Huber challenges the court's findings that Huber failed to have the carpets cleaned and that Huber should have had the tree limb removed. In appeals from a bench trial, we will not reverse the circuit court's findings of fact unless they are clearly erroneous. *Crum v. Craig,* 2010 Ark. App. 531, 379 S.W.3d 71; *Davenport v. Burnley,* 2010 Ark. App. 385, 2010 WL 1790780. A finding of fact is clearly erroneous when, although there is evidence to support it, we are left with the definite and firm conviction that a mistake has been committed. *Dye v. Anderson Tully Co.,* 2011 Ark. App. 503, 385 S.W.3d 342.

■ As to the carpet cleaning, Huber argues that it introduced, without objection, an invoice from a carpet-cleaning company showing the carpets were professionally cleaned in March. The circuit court, however, specifically found that Chase Allen's testimony that Huber prom-ised to clean the carpets prior to the Allens' moving in was credible. In reviewing a circuit court's findings of fact, we give due deference to the trial court's superior position to determine the credibility of the witnesses and the weight to be accorded their testimony. *Stadler v. Warren,* 2012 Ark. 65, 389 S.W.3d 5. At trial, Chase testified—and Kim Thornton agreed—that Thornton said that, if the Allens would get the electricity turned on, Huber would have the carpets cleaned. The fact that the carpets had been cleaned in March, after the previous tenant moved out, is immaterial, as the circuit court believed Chase's testimony that Huber promised to clean them again before the Allens moved in.

■ Huber also challenges the circuit court's findings regarding the tree limb. Huber asserts that, "[p]er the terms of the lease agreement, the tenant/appellee was responsible for all yard work," and it claims that Chase testified that he knew he was responsible for his own yard work. The contract, however, did *not* provide that the tenants were responsible for "all" yard work. The lease specifically provided, in paragraph 10, that the tenant was to "keep and maintain the premises in a clean and sanitary condition at all times." Upon termination of the lease, the tenant was to "surrender the premises to Lessor in as good condition as when received, ordinary wear and damage by the elements excepted." Finally, the lease stated that it was "expected that the lessee will mow the grass as necessary in a timely manner."

We find nothing in this provision that could be construed as requiring the tenant to remove a fallen tree that reached from the front door to the street. Tree removal is a specialized service, not an item that falls within the ambit of "keep[ing] and maintain[ing] the premises in a clean and sanitary condition," and the only exterior

maintenance specifically required of the tenant is mowing the lawn. Moreover, we agree with the Allens' assertion that having a tree fall in one's yard would constitute "damage by the elements," which was an exception from the requirement to return the property to the lessor in as good condition as when received. Thus, based on the facts presented at trial, we cannot say that the circuit court's findings were clearly erroneous, and the court's order of dismissal of Huber's complaint is affirmed.

As a final matter, we wish to draw attention to the flagrantly deficient abstract filed by Huber's counsel. Arkansas Supreme Court Rule 4–2(5)(A) requires that "[a]ll material information recorded in a transcript ... must be abstracted," and Rule 4–2(5)(B) provides that the abstract "shall be an impartial condensation, without comment or emphasis, of the transcript." Huber's abstract is deficient, inaccurate, and misleading in numerous respects. For example, Huber abstracted Thornton's testimony about the garbage disposal as follows:

> I sent Larry, the Huber Rental Properties maintenance guy, to look at the disposal and he determined that it needed to be replaced. I explained to Chase Allen that the garbage disposal was not an item necessary for living in the house and that it was not creating a hazard in any way for the Allens.

The actual testimony, with questions by Chase Allen, is as follows:

Q: What about the sink disposal?

A: The sink, the garbage disposal is not a have-to-have. I mean, it's something that you can live in there without having, comfortably.

Q: So when we moved in you said that you'd have the carpets cleaned, which you're saying you didn't say, and that the disposal would be fixed. Your maintenance guy said it needed to be replaced. And so you're saying he didn't say it needed to be replaced?

A: No, it needed—it needs to be replaced. But it's something that you do not—you have to have to live at the property, and is not a hazard in any way.

Q: Only when—

A: And we assessed that it needed to be fixed, but we never promised that we would or when it would be.

As the Allens point out in their supplemental abstract, the transcript is clear that Thornton did not "explain" to the Allens at the time the lease was signed that the disposal was not essential.

Similarly, Huber omitted from the abstract Thornton's testimony that she told the Allens that if they had the electricity turned on, Huber would have the carpets cleaned. Huber abstracted Chase Allen's testimony about not paying rent as "I made no attempt to vacate the premises due to a lack of the repairs not being made; I merely withheld rent." Chase's actual testimony, however, was this: "I did everything that I could to—we would've paid rent the second you [Huber] took care of stuff. [But] you wouldn't come out and do anything to take care of it." Chase's statement that "I guess there's not" a promise of repair in the lease is abstracted as, "The lease agreement does not make any promises of repairs." Additionally, as noted in the footnote above, Thornton's rebuttal testimony is omitted in its entirety.

We find Huber's distortions and inaccuracies to be extremely unprofessional. The portions of testimony that were misstated or obfuscated were material to the trial court's factual findings, and it appears that Huber has attempted to bolster

its arguments by misrepresenting what was actually stated at trial. While we do not elect to impose sanctions at this time, we advise counsel to be more cautious in the future and mindful of his responsibilities of candor to the court.

Affirmed.

PITTMAN and ABRAMSON, JJ., agree.